[S. F. No. 1577. In Bank.—August 3, 1900.]

## FRESNO CANAL AND IRRIGATION COMPANY, Respondent, v. ADELINE B. PARK et al., Appellants.

IRRIGATION OF LANDS—LIEN OF WATER COMPANY FOR ANNUAL RATES—CONSTRUCTION OF CONTRACT—COVENANTS BINDING REPRESENTATIVES. In the absence of any law regulating water rates, a water company engaged in the irrigation of lands in a farming district may enforce a lien upon the lands to which water is supplied, as against a subsequent purchaser thereof, for nonpayment of the annual rates fixed by the contract with the original owner, when the contract makes the water supplied thereunder an appurtenance to the land upon which it is to be used, and contains a covenant binding the owner of the land, his heirs and assigns and successor in interest, to pay a fixed sum per year to the water company, although technically such covenant does not run with the land.

ID.—PUBLIC USE—REGULATION OF WATER RATE—FRANCHISE—CONSTITUTIONAL LAW—CONSTRUCTION OF CONSTITUTION.—The provisions of the state constitution making the use of all water appropriated

for sale, rental, or distribution a public use, and subject to
the regulation and control of the state in the manner to be pre-
scribed by law, and declaring that the right to collect rates
or compensation for the use of water in any county, city and
county, or town, or the inhabitants thereof, is a franchise, and
cannot be exercised except by authority of and in the man-
ner prescribed by law, are not to be construed as taking away
the right under the general law of the land to collect rates or
compensation fixed by contract of the parties for the irrigation
of lands, in the absence of a special statute, or authorized pro-
vision, regulating such rates.

ID.—CONSTRUCTION OF ACT OF 1885—POWER OF SUPERVISORS—MAXIMUM
RATES — RIGHT OF CONTRACT.—The act of March 12, 1885 (Stats.
1885, p. 95), does not destroy the right of contract between ir-
rigation companies and the owners of land. It merely allows
the supervisors upon proper petition to fix maximum rates,
and the power of contract within such maximum rates is still
preserved, and until the supervisors shall have acted, persons
selling water are allowed to continue to collect their established
and customary rates, without being required to make a formal
declaration or to secure an ordinance to that effect.

APPEAL from a judgment of the Superior Court of Fresno
County.   J. R. Webb, Judge.

The facts are stated in the opinion of the court.

M. K. Harris, and H. C. Campbell, for Appellants.

William J. Hunsaker, *Amicus Curiae,* also for Appellants.

John Garber, and Frank H. Short, for Respondent.

W. B. Treadwell, and A. Haines, *Amici Curiae,* also for Re-
spondent.

Works & Works, Independent *Amici Curiae.*

McFARLAND, J.—This is an action to enforce a lien against
certain land of the defendants Adeline B. Park and her hus-
band, William Park, alleged to have been created by a certain
instrument in writing made by and between plaintiff and one
Perrin, who was said defendants' predecessor in interest in the
land.   The other defendants are made parties as claiming some
interest in the premises.   Defendants demurred to the com-
plaint, and their demurrer was overruled.   They declined to
answer and judgment was rendered for plaintiff, and they ap-

peal from the judgment.  It is admitted by appellants that all
special causes of demurrer were obviated by a stipulated amend-
ment to the complaint; so that the only ground of demurrer
to be considered is the general one that the complaint does not
state facts sufficient to constitute a cause of action.

These facts appear from the averments of the complaint: The
respondent is a corporation organized in February, 1871, for
the purpose of straightening, improving, etc., the natural chan-
nel of Kings river and its branches, and taking water there-
from by means of canals and ditches for various beneficial uses,
and, among others, for the disposition of the waters and "col-
lecting annual rents and charges therefor."  On March 28,
1892, respondent and one E. B. Perrin executed a written in-
strument, which was duly acknowledged by the parties and was
recorded on the 31st of the same month.   Plaintiff's canals and
ditches run through an agricultural region, and do not furnish
water within any city, town, or municipality.  The covenants
of this instrument necessary to be mentioned here are as fol-
lows: The respondent, in consideration of a certain sum of
money then paid it by Perrin, covenanted to furnish to the lat-
ter from its main canal, or from a branch thereof, all the water
that may be required for the irrigation of a described piece of
land then owned by him, for a certain number of years com-
mencing May 28, 1892, "not exceeding at any time one cubit
foot per second."   The respondent agreed to put a suitable gate
in the bank of the canal at the most convenient point for the
conveyance of water to Perrin's land; and Perrin agreed to con-
struct a ditch from the gate to his land at his own cost, etc.
Perrin agreed that he would not use the water, or permit it to
be used, on any land other than that described in the instru-
ment, and would not permit it to run to waste, and would pro-
vide means to carry any surplus water back to the respondent's
canal.   It was declared that the water to be thus furnished was
intended to be an appurtenance to and to run with the land,
that the right thereto was to be transferable only with the land,
and that respondent was to be bound by the instrument only to
subsequent owners of the land.   Perrin covenanted for himself,
his heirs, assigns, and successors in interest, for the payment
annually to respondent of the sum of one hundred dollars on

the first day of September of each of the years mentioned. It was agreed, also, that respondent might make a certain number of similar contracts with other persons, and that if at any time the aggregate quantity of water should be insufficient to supply all the contractors, Perrin, and each of the others, should receive his proportionate share. It was declared that the covenants of Perrin should run with and "bind the land." The foregoing are, we think, all the covenants of the instrument which need at present be mentioned.

It is averred that prior to September 1, 1897, Perrin conveyed a certain described part of the land to the appellants Adeline and William Park, who since then have been and are the owners in fee and in possession of the same. It is further averred that ever since the execution of said instrument the respondent "duly performed each and all of the covenants and agreements therein contained on its part to be performed"; and it is averred that there is due and unpaid upon said contract, and chargeable upon the said land conveyed to appellants as aforesaid, certain amounts due for several of the years, aggregating one hundred and fifty dollars and interest.

We are not embarrassed with the question whether or not the instrument upon which the action is founded creates a lien on the land in the hands of the appellant. In their opening brief counsel for appellants say: "It is admitted for the purposes of this argument that, if valid, this contract runs with and binds the land in the hands of appellants to the same extent that it would in the hands of the said E. B. Perrin." Moreover, it was expressly held in *Fresno etc. Irr. Co. v. Rowell*, 80 Cal. 114,[1] and in *Fresno etc. Irr. Co. v. Dunbar*, 80 Cal. 530, that an instrument exactly like the one in question here—and to which the present respondent was a party—did create a lien enforceable against the land in the hands of a subsequent owner, although technically it did not "run with the land." But appellants contend that the contract is, in all its parts, utterly void, and therefore without any legal effect even as between the original parties.

The theory that a contract like the one in question here cannot be legally made is of recent origin. Until within the last

---

[1] 13 Am. St. Rep. 112.

few years no one would have thought of doubting that the owner of a water ditch could supply water to a customer for mining or irrigation purposes on such terms as the two might agree upon. It is now said that such a contract is forbidden by the present state constitution which was adopted in 1879. But the two cases above cited from 80 California—in which the present respondent was plaintiff and in which contracts like the one here in question, made by respondent with other parties, were upheld—were decided in 1889; and the case of *Balfour v. Fresno etc. Irr. Co.*, 109 Cal. 221, where a similar contract (made also by respondent) was upheld, was decided as late as September 27, 1895. To the same effect are *San Diego Flume Co. v. Chase*, 87 Cal. 561, *Clyne v. Water Co.*, 100 Cal. 310, *Merrill v. Irrigation Co.*, 112 Cal. 426, decided in 1896, and *Fairbanks v. Rollins*, 54 Pac. Rep. 79, decided August 4, 1898. It is contended, however, that those cases should not be considered of any value as authorities here because in all of the said cases the court had entirely overlooked or forgotten prominent provisions of the constitution now called to our attention, and the learned counsel of the parties opposed to the present respondent in those cases failed, through dimness of mental vision, to see and call attention to the conspicuous wall of the constitution behind which, according to appellants' contention, they could have safely put their client. It would be remarkable, indeed, if during the consideration of all these various cases, and down to 1898, the thought never suggested itself to either court or counsel that the novel and notable provisions of the constitution about water, now relied on, could be invoked as defenses to those actions; but, as such a thing is barely possible, we will give the question an independent investigation.

The parts of the constitution relied on by appellants are sections 1 and 2 of article XIV. The first clause of section 1 is as follows: "The use of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution, is hereby declared to be a public use, and subject to the regulation and control of the state in the manner to be prescribed by law." The rest of the section applies exclusively to cases where water is supplied to incorporated cities or towns, or to that other kind of municipality known as a consolidated "city and county," so

that the parts of the section other than the first clause need not here be considered—except so far as they throw light upon the meaning of section 2 and upon certain statutory law. Now, there is nothing in the said first clause of section 1 above quoted which, in itself, at all affects the validity of the contract in question in the case at bar. The clause merely declares that the use of water appropriated for distribution, etc., is a public use, and that the state may by law regulate it.

Section 2, which is mainly relied on, is as follows: "The right to collect rates or compensation for the use of water supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law." Appellants seem to lay great stress on the fact that the word "franchise" is used in this section, as if "franchise" were a negative word signifying prohibition, instead of being, as it is, an affirmative word denoting a grant. Whatever right a ditch owner had to sell and distribute water at the time the constitution was adopted, or afterward, was not destroyed because it was called in the constitution a franchise. The real meaning of "franchise" is a privilege granted—not a right taken away; but the word was evidently employed in section 2 mainly for the purpose of emphasizing the general declaration in section 1 that the use of water for sale, distribution, etc., is a public use, and with the notion, no doubt, that calling it a franchise would make more clear and certain the intent to subject it to state regulation. In all other respects the meaning and effectiveness of section 2 would be the same if the words "is a franchise, and" were not there.

But the serious questions arising out of section 2 are as to the meaning of the words "cannot be exercised except by authority of and in the manner prescribed by law." This is the language upon which the contention of appellants is ultimately based, and which is to be seen prominently reiterated through the pages of their briefs. The contention really is, although somewhat thinly veiled, that respondent could not collect any rentals, or make any valid contract about the same, unless the legislature had passed a law—a "statute law," as they say—expressly giving the power and prescribing the manner in which

it should be exercised, and that the demurrer should have been sustained because such statute was not set up in the complaint. This contention rests on the proposition that when the constitution was adopted in 1879 it immediately prohibited the owner of a water ditch from selling any water or making any contract about furnishing water, or collecting any rentals therefor, until the legislature should enact a statute expressly conferring power to do these things; and, further, that the constitution gave the legislature power, by inaction, to utterly destroy all property in ditches and water rights used for the distribution and sale of water. This proposition cannot be maintained; and we do not think that any authority cited by appellants goes to the extent of clearly and frankly declaring that to be the law, after a careful consideration of its full significance.

All the provisions of the constitution on the subject must be considered together, and in the light of the evils sought to be remedied and the condition of the property in ditches and the use of water at the time the constitution was adopted. The appropriation, diversion, distribution, and sale of water have been a prominent business in California since its first settlement by Americans. During its early American history its leading industry was mining, and the diversion of water from rivers and small streams to the localities where the mines were discovered was an absolute necessity to the business of mining. Consequently, immense sums of money were invested in water rights, and in ditches which were constructed at great expense in nearly every part of the mining regions. At later periods still larger ditches were constructed through regions devoted to agriculture, and water furnished, for compensation, for irrigation. In many parts of the state these ditches were as essential to farmers as those in the mountains were to miners. The amount of compensation to be paid for the water furnished was determined by the private contracts of the parties. Property and ownership in these ditches, and in the use of the water flowing therein for sale and distribution, in which millions of money have been invested, were as deeply founded and as thoroughly established in the law as property in any other thing capable of ownership. Such was the situation when the constitutional convention met in 1878. Is it possible that the convention intended to practically destroy, or confiscate, all this

immense property, or to allow the legislature to do it? It could not have accomplished this result within the principles of the federal constitution, and it is not to be held that it intended to do so unless the language of the constitution which it constructed leaves no doubt on the subject. According to the proposition upon which appellants' contention rests, the owners of water ditches intended for the distribution and sale of water were stripped of all beneficial attributes of ownership therein from the adoption of the constitution until such time as the legislature might see fit, by statute, to confer upon them the privilege of enjoying their own property. Numerous consumers might be anxious to obtain water at prices readily agreed upon, but no contracts about it could be made. Would the water have to run to waste unless those desiring it took it forcibly without compensation? No such state of affairs was contemplated by the convention, nor intended by the language of the constitution.

It was no doubt contemplated that the main evil to be remedied existed in cities and towns, where it was feared that a corporation having practically the monopoly of furnishing water therein, would, by exorbitant charges, oppress the large number of small buyers who are compelled to have water constantly for domestic purposes. Therefore, it is provided with great detail in section 1 how compensation for water furnished within municipalities may be collected—it being provided, among other things, that said compensation "shall be fixed" annually by the "governing body" of the municipality, and that said body shall be "subject to peremptory process to compel action in the matter," and to "penalties" for not taking action. The section also provides that if the persons or corporations furnishing water in municipalities shall collect "compensation" therefor otherwise than as established by the governing body, their franchise "and waterworks" shall be forfeited to the municipality. Whether the latter clause could be enforced is a question not arising in the case at bar, but it shows, as other provisions of section 1 show, that the convention, when dealing with the subject of water, had particularly in view the furnishing of water within municipalities, and determined that it would itself handle and legislate upon that branch of the subject so far as to leave

little, if any, power to the legislature in the premises. But nothing of the kind appears in the constitution about water rights and ditches existing and running through mining and agricultural districts, etc., outside of municipalities. As to this latter class of property, with respect to which private contracts for compensation for the use of water had been the rule, and apparently had been satisfactory to both purchasers and consumers, the convention, apprehending that there might come evils outside of municipalities somewhat similar to those feared within them, took the precaution of declaring, so that such would be the law beyond question, that the use of water appropriated for distribution and sale should be a public use, and subject to the regulation and control of the state. But it left to the legislature the power and discretion of regulating the sale of water outside of municipalities if the time should come when, in its wisdom, it thought such regulation was called for —or to allow the people to continue to freely contract on the subject as they had been accustomed continuously to do since before the state was organized as a government. In the light of the foregoing views, the provision of section 2 that the right to collect compensation for the use of water "cannot be exercised except by authority of and in the manner prescribed by law," means that if the legislature shall by statute prescribe the particular manner in which the right shall be exercised, that manner (if it be reasonable) must be followed if consumers insist on it; but, in the absence of such statute, then "by authority of law" means by the authority of the general substantive law of the land in which all rights of property and its use or enjoyment are founded. Our conclusion is that the contract involved in the case at bar is not made invalid by the provisions of the constitution invoked by appellants.

We do not deem it necessary to extend this opinion by noticing in detail the various authorities cited by counsel. There is no doubt that the numerous decisions of this court cited by respondent impliedly, at least, uphold contracts like the one here in question; although there is, perhaps, some force in the claim of appellant that in most of those cases the points here made may have been overlooked. Both sides cite cases from Colorado, some of which are favorable to respondent's views,

and others, no doubt, favorable to some extent to the views of appellants. But the latter are, we think, mainly founded upon the provision of the constitution of Colorado—materially different from the provisions of our constitution on the subject—which declares that the water of all natural streams not theretofore appropriated is "the property of the public." The question involved here has also been before the federal courts sitting in this state; but the result of their action, as will be hereafter seen, has been to leave it undecided.

The only act passed by the legislature touching the subject here under consideration which calls for special notice is the act of March 12, 1885. (Stats. 1885, p. 95.) There was another act on the subject passed March 12, 1880 (Stats. 1880, p. 16); but no action was taken under it, and it is very little discussed in the briefs of counsel. The later act of 1885 covers the subject, and supersedes most of the provisions of the act of 1880. In the act of 1885 the legislature does not, itself, undertake to prescribe any rule about compensation for water. It simply gives power of regulation to boards of supervisors in the event that they are petitioned to exercise such power by "not less than twenty-five inhabitants who are taxpayers," etc. Upon such petition the supervisors are authorized to fix and regulate "the maximum rate at which any person, company," etc., may sell, rent, or distribute water. The board or boards of supervisors in the county or counties in which respondent's ditches are situated have, however, never taken any action under the statute, no petition for such action having been presented, and therefore there are no regulations of said boards to be considered; but appellants contend that respondent's rights have been impaired or destroyed by some general provisions of the act. This contention, however, cannot be maintained. The statute, even if it can be said to have any effect in the absence of any action by the supervisors, clearly contemplates only the fixing by the latter of "maximum rates." Section 8 of the act provides that anyone selling water must do so at rates "not exceeding the established rate"; and section 9 provides that any such person whose water rates "have been fixed and regulated by a board of supervisors" who shall collect water rates "in excess of such established rates" shall be liable

in an action for damages. There is nothing in the act making it illegal to contract for less than the maximum rates. Appellants contend that the act has some significance notwithstanding the fact that the supervisors have not acted, because it is provided in section 5 that until the supervisors shall have acted "the actual rates established and collected" by the water owners "shall be deemed and accepted as the legally accepted rates." This simply means that until compensation shall be fixed by the supervisors persons selling water shall continue to collect as they have been accustomed to do. It refers to things as they existed; it is in the nature of a recital; it is certainly not a command, as appellants seem to think, that the persons or companies referred to must by resolution or declaration, or by something in the nature of an ordinance passed by the municipal body, formally announce the terms upon which they will continue to distribute water. But even appellants' view is substantially met by the averment in the complaint that respondent "has been so engaged in conveying and furnishing water and charging and collecting therefor, particularly under contracts similar in form and substance to those set forth, alleged, and described in this complaint"; and so we think that there is nothing in the statute invoked which makes the contract here in question invalid. Even if the supervisors had fixed the maximum rates, we see no reason why a consumer would not still have had the right to make a contract which he considered more advantageous to him than the established rate. This seems to be the construction given it by the legislature. By an act passed March 2, 1897 (Stats. 1897, p. 49), the act of 1885 was amended as follows: "Nothing in this act contained shall be construed to prohibit or invalidate any contract already made, or which shall be hereafter made, by or with any of the persons, companies, associations, or corporations described in section 2 of this act, relating to the sale, rental, or distribution of water, or to the sale or rental of easements and servitudes of the right to the flow and use of water; nor to prohibit or interfere with the vesting of rights under any such contract." Several questions arising out of this amendment are discussed by counsel— as whether it expressly validates all former contracts like the one involved here, whether such a contract could be thus

validated, what the general effect of the amendment is, etc. Under our views of the case it is not necessary to determine these questions; but it may certainly be said that the amendment is a legislative construction, and, as such, entitled to consideration.

There is no question in the case at bar about the power of the state to fix compensation, nor the right of a consumer to demand water at rates which have been established, nor the equal distribution of water among consumers of the same class, nor the right to the continued use of water under section 552 of the Civil Code. Something is said by appellants about the money paid by their predecessors at the date of the contract—which is called by them a "bonus"—but it is difficult to see how that matter can now be brought into view, as the only moneys here involved are the yearly rentals; and even if it were involved here the payments of part of the rental in advance would certainly not vitiate the contract. Neither do we see, so far as this case is involved, any profit in considering the distinction sometimes made between the ownership of the use of water and the ownership of its *corpus;* that distinction in no way affects the right of a ditch owner to divert and convey water for distribution and rental.

The situation arising out of the decisions of the federal courts above referred to is this: In two or three cases, and particularly in *Souther v. San Diego Flume Co.,* considered in *San Diego Flume Co. v. Souther,* 90 Fed. Rep. 164, and *Lanning v. Osborne,* 76 Fed. Rep. 319, the learned judge of the circuit court of the United States for the southern district of California—for whose learning and ability as a jurist we have the very highest respect—expressed some opinions which are, no doubt, to some extent in discord with the views hereinabove expressed; but upon appeal in the Souther case to the United States circuit court of appeals the judgment of the lower court was reversed, and a decision made in accord with our views. (*San Diego Flume Co. v. Souther,* 90 Fed. Rep. 164.) Afterward, however, the circuit court of appeals granted a rehearing in the Souther case, for what reason we do not know; and as that court has not yet rendered another decision in the case, the question, so far as the federal courts are concerned, is left undecided. We think,

however, that the opinion rendered by the circuit court of appeals correctly declares the law upon the subject; and although a rehearing has been granted we desire to quote some of the language there used.  The court say: "It becomes necessary, therefore, to determine whether the circuit court erred in ruling that 'under the constitution and statutes of California' a corporation created for the purpose of appropriating waters of the state, and delivering the same for irrigation, is bereft of the power to enter into contracts with the consumers thereof."  The court, after quoting the language of the constitution, and referring to the said statute of 1885 and to various decisions upon the subject, and asking what the trend and purport of the decisions are, say: "They are to the effect that, notwithstanding the fact that the constitution declares that the use of waters of the state appropriated for irrigating purposes is a public use, and the further fact that, under the law of 1885, upon the petition of twenty-five consumers, the commissioners of the county may fix the rates to be charged by the company and paid by the consumers, nevertheless until such rates are fixed in pursuance of law, the corporation furnishing the water and the consumer receiving it are left free to make such contracts as they may see fit to make, and their agreements will be sustained in the court. In other words there is no provision of the laws of the state and no principle of public policy which inhibits such contracts."

Appellants cite a subsequent decision of that court in the case of *San Diego Land etc. Co. v. Sharp,* 97 Fed. Rep. 394; but the question was not there involved or decided.

The suggestion of appellants that the law as they construe it does not cover the comparatively few instances where water is appropriated to be used exclusively on the land of the appropriators, has no pertinency to the question here involved.

The judgment appealed from is affirmed.

Van Dyke, J., and Garoutte, J., concurred.

TEMPLE, J., concurring.—I concur in the judgment, and generally in the opinion of Mr. Justice McFarland.  But while I agree with the construction given to the act of 1885, to wit, that it only prescribes the maximum rates and does not prohibit special contracts between the suppliers and the consumers

of water, yet, in my opinion, the power to regulate conferred and enjoined upon the legislature by sections 1 and 2 of article XIV of the constitution is plenary, and the legislature may, if it sees fit, prescribe the only rates and the only terms upon which water may be sold, rented, or distributed. The legislature may deem it desirable not only by its regulation to prevent extortionate charges, but also to prevent favoritism or unjust discrimination. Until it does so, however, I think the parties interested are free to contract.

It is matter of less consequence, but I do not concur in the view that the cases of *Fresno Canal etc. Co. v. Rowell*, 80 Cal. 114,[2] and *Fresno Canal etc. Co. v. Dunbar*, 80 Cal. 530, are, as authorities, entitled to much weight in this discussion. Nor do I think it a matter to excite our special wonder if, as stated in the opinion, until within the last few years no one would have thought of doubting the right to so contract, that in suits brought some fourteen years ago neither counsel nor the court should have made such a point. But since in those cases the point was not raised and was not alluded to, it could not have been passed upon. The practice of this court is not to decide points involved on appeal unless they are actually raised. And the suggestion that such points are involved in a petition for a rehearing has not found much favor. True, the court has always claimed the right to raise points for itself when it is thought that the ends of justice demand it, but so well known is the practice that when the exception is made we are sure to get an earnest protest in a petition for a rehearing. It is a common occurrence in noticing authorities cited to observe that the point in hand is not discussed in them because not raised. The correct rule as to the value of precedents and the reason for it is stated by Chancellor Kent, in 1 Kent's Commentaries, 476, as follows: "If a decision has been made on solemn argument and mature consideration, the presumption is in favor of its correctness, and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions and contracts by it." And the author further says that the value of precedents depends upon the number and uniformity of the decisions and the solidity of the reasons on which

---

[2] 13 Am. St. Rep. 112.

the decisions are founded, and the perspicuity and precision with which these reasons are expressed. Upon this basis the opinions cited do not possess much value.

There is in the opinion an expression utterly foreign to any matter involved here, which I fear may be deemed a suggestion of a doubt as to the validity of the provision for a forfeiture contained in section 1 of article XIV of the constitution. No one is demanding a ruling upon that matter here, and there is therefore no occasion to reserve such question, if it be a question. If it were a matter for us I should say there is grave doubt both as to the wisdom or justice of that provision, but I see no reason whatever to doubt its validity. A law prescribing a very excessive penalty sometimes secures practical immunity, and instead of securing the enforcement of the law, removes its sanction altogether.

Harrison, J., concurred in the concurring opinion.

Rehearing denied.