IMPERIAL WATER CO. NO. 5 v. HOLABIRD et al.†

(Circuit Court of Appeals, Ninth Circuit. May 6, 1912.)

No. 2,001.

1. WATERS AND WATER COURSES (§ 240*)—IRRIGATION COMPANIES—APPROPRIATION OF WATER—WATER RIGHTS.

Under Const. Cal. art. 14, § 1, which declares that the use of all water appropriated for sale, rental, or distribution is a public use and subject to state regulation and control, and the statutes enacted pursuant thereto, Civ. Code Cal. § 1410 et seq., which require the appropriator of water to designate the place of use and to at once commence and continue the construction of works to apply it to such use, an irrigation company by appropriating water for use on public lands, then unoccupied, and in advance of the actual construction of works, does not acquire the water right appurtenant to such lands so as to be enabled to charge subsequent settlers for such naked right in addition to rates for the water furnished.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 240.*]

2. WATERS AND WATER COURSES (§ 232*)—IRRIGATION COMPANIES—CONTRACTS—VALIDITY.

Complainant, a state corporation, made an appropriation of the greater part of the water of the Colorado river for the irrigation of lands in Mexico and the Imperial Valley in California, which were then public lands owned by the United States and the state. The lands were

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied October 7, 1912.

desert lands, and there was no other source from which they could be irrigated. Complainant's canal commenced in California, extended into Mexico, and back across the boundary. It organized a company in Mexico to have charge of that part of its works, of which it owned all of the stock. It also later organized subordinate mutual companies, each of which was to furnish water for the irrigation of certain designated lands in the valley to its stockholders who were required to be owners of such lands and to purchase one share of stock for each acre to be irrigated. They were also required to pay rates for the water which was to be supplied by the Mexican Company. *Held*, that a contract between complainant and such a local company, by which the latter agreed that complainant should have all of its capital stock with the right to sell the same to settlers at such prices as it might. fix and keep the proceeds, the effect of which was to enable complainant to charge such settlers for the water rights to their lands, was void for want of consideration.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 321, 322; Dec. Dig. § 232.*]

Gilbert, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Southern Division of the Southern District of California.

Suit in equity by W. H. Holabird, as receiver of the California Development Company, and the California Development Company, against the Imperial Water Company No. 5, for cancellation of a written instrument. Decree for complainants, and defendant appeals. Reversed.

The California Development Company, the complainant in this action, is a corporation organized and incorporated under the laws of the state of New Jersey on the 23d day of April, 1896, with a capital stock of $1,250,000, divided into 12,500 shares of $100 each. The general purpose of the corporation was to appropriate and divert a large part of the flow of the Colorado river at or near a point on the right or westerly bank of the river in the state of California, known as Hanlon's Heading, and to conduct the water so diverted through a canal in a southwesterly course into Mexican Territory, and thence, for a distance of more than 50 miles, by artificial and natural channels, in a circuitous course northwesterly across the boundary line and back into the United States to a large tract of unoccupied public land in the county of San Diego (later the county of Imperial) in the state of California, and known as Imperial Valley. The canal in the Republic of Mexico was placed in the name of a Mexican corporation organized on May 15, 1898, as La Sociedad de Yrrigacion y Terrenos de la Baja California, and referred to in these proceedings as the "Mexican Company."

The capital stock of the Mexican Company was $62,500, divided into 625 shares of the par value of $100. All of the stock of the Mexican Company was owned by the complainant, and it is conceded that the Mexican Company was but a means employed by the complainant to carry out the purposes of its organization which were to manage the affairs of complainant's canal in Mexican territory and deliver water at the international boundary line to corporations formed in California by the complainant to receive such water.

It is stipulated by the parties to this action that at various dates commencing as early as December 2, 1893, down to at least as late as December 2, 1908, the California Development Company and its various predecessors in interest posted and caused to be duly recorded, in the recorder's office of the proper county, notice of the appropriation in the statutory form of 10,000 cubic feet per second of the waters of the Colorado river for the irrigation of lands in the county of San Diego, later the county of Imperial, in

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the state of California, and of lands in Lower California, Republic of Mexico, and for other purposes.

In further execution of the project of the complainant to control the appropriation and diversion of the waters of the Colorado river for the irrigation of the lands in Imperial Valley and to create convenient agencies for the distribution and sale of such waters, the complainant caused to be incorporated under the laws of the state of California a number of corporations to take and receive water for irrigation, domestic, and other purposes from the "Mexican Company," and distribute the same among the stockholders of the corporations for use only on lands owned by them within certain designated boundaries described in the articles of incorporation. These corporations were all designated Imperial Water Companies, and as originally projected were numbered 1 to 12, but the companies were not all brought into active corporate existence. No. 2 was merged with No. 4, and, as far as can be ascertained from the present records, Nos. 3, 9, 10, and 11 never became active.

The complainant mapped out for these corporations districts of territory of the public lands in Imperial Valley as units for irrigation, each one of which was to be occupied by the settlers who were to be stockholders in one of the companies. The first one of the companies to be organized was Imperial Water Company No. 1, incorporated March 23, 1900, with a capital stock of $1,000,000, divided into 100,000 shares of $10 each. The territory assigned to the stockholders of this company embraced an area of about 100,000 acres—corresponding to the number of shares of the capital stock of the company. Each share of the stock represented the right of the stockholder to receive water from the "Mexican Company" for one acre of land owned by him, which, under a contract with that company, was fixed at four acre-feet per annum for each share of stock, for which the stockholder was required to pay the Mexican Company a water rate of 50 cents per annum per acre-foot.

The several companies were organized, one after another, by the complainant on the same general plan as Imperial Water Company No. 1, and embraced lands in assigned districts of different, but presumably of convenient, areas. The purpose of the complainant was to organize these water companies for assigned districts until all the irrigable public land in Imperial Valley should be assigned to a water company. The aggregate of the capital stock of Imperial Water Companies numbered 1, 4, 5, 6, 7, 8, and 12 amounted to $4,700,000, divided into 470,000 shares of $10 each, and representing 470,000 acres of land.

The defendant, the Imperial Water Company No. 5, was incorporated on February 21, 1901, with a capital stock of $1,000,000, divided into 100,000 shares of $10 each. The declared purpose of the corporation was to secure a supply of water for irrigation, domestic, and other purposes from the "Mexican Company," and to distribute the same at cost among its stockholders only for use upon the lands owned by them within the boundaries described in the articles of incorporation. The land assigned to this company by the complainant embraced 100,000 acres, and each share of stock, as in the other companies, represented an acre of irrigable land for which the Mexican Company, by an agreement with the defendant company dated March 15, 1901, agreed to supply the defendant company with four acre-feet of water per annum for each share of stock at the rate of 50 cents per annum per acre-foot. In consideration of this agreement on the part of the Mexican Company to deliver water for use on the lands represented by the stock of the defendant company, the latter agreed that the Mexican Company should have the exclusive right to sell the entire shares of its capital stock and receive for its sole use and benefit all the moneys obtained from such sale of stock.

But by an agreement, dated December 28, 1900, between the complainant and the Mexican Company, the former had agreed that it would build a system of canals for the diversion of water from the Colorado river, to keep such canals in repair, and deliver a sufficient amount of water for the irrigation of the lands situated in the Republic of Mexico and the United States

which were irrigable by gravity by the system of canals to be constructed by the complainant. In consideration of this agreement, the Mexican Company assigned and transferred to the former all of the stock of Imperial Water Company No. 1 and all the right to receive any of the moneys which would otherwise be due and payable to the Mexican Company under its contract with the water company; and it was further agreed that the Mexican Company would make like assignments in the future of all rights which it might acquire under similar contracts with other water companies for the sale of stock of such companies, or the proceeds to be derived therefrom. Under this agreement, and a subsequent agreement between the complainant and defendant dated December 24, 1901, all of the stock of the defendant company passed to the complainant for sale, together with the proceeds of the sale of the stock of the defendant company, with a stipulation contained in the later agreement that no stock of the defendant company should be issued except upon the order of the complainant, and that no stock of the defendant company should be issued or sold in the future by the complainant except upon there being paid into the treasury of the defendant company, at the time of such issue, $1 for each share of stock so issued or sold; such sum of money to be used and to become a part of a fund for the construction of an extension of the canal system so as to furnish water for the land represented by the stock that might thereafter be issued.

The defendant had been organized as a corporation by agents of the complainant to whom one share of stock each had been given by the complainant. These incorporators had never at any time been landowners or settlers upon the public lands within the territory assigned to the defendant company, nor had there been at the time of such organization any settlements made within such territory, and no settlements had been made upon the land before the time the contract was made with the Mexican Company for the delivery of water to such land and the surrender of its capital stock. The land belonged to the government of the United States, except such school sections in each township as belonged to the state, and except a few alternate sections in the northern part of Imperial Valley within the grant to the Southern Pacific Railroad. The land was in its original desert and arid condition, and so remained until occupied and reclaimed in part by settlers in accordance with the complainant's irrigation scheme. In carrying out this scheme, it was recited in the agreement between the complainant and the defendant, dated December 24, 1901, that, in order that an equitable division of the directory of the defendant company should be had, it was agreed that two members of the five members of the board of directors of the said company should resign, and that in their place should be elected two members chosen as directors by the then outstanding stock in said company. It was further agreed that the board of directors as thus composed, being three of the then existing directors named by the complainant and the two newly elected directors named by the stockholders of the defendant company, should remain the directors of such company without change until the annual election to be held in January, 1903. The board of directors was thereupon organized in accordance with this agreement, and so continued until January, 1903, when the board became composed entirely of representatives selected by the stockholders.

Settlers upon the lands within the district assigned by the complainant to the defendant company were required, as in other districts, before the delivery of any water to them, to buy from the complainant a number of shares of defendant's capital stock, equal in number to the number of acres claimed by the settler, and to pay therefor such arbitrary price as the complainant might fix. As there was no other source of water supply for that territory, the settler was compelled to submit to the conditions imposed by the complainant.

On August 27, 1901, the complainant fixed the price of stock in all the water companies on and after October 1, 1901, at $15 per share. On September 5, 1901, the price was fixed at $20 per share; and after July, 1905, the price was raised to $25 per share. In addition to this price for stock representing the right to have water delivered to a certain number of acres of land, the settler was required by the complainant, through the Mexican Com-

pany, under the agreement of March 15, 1901 to pay an annual rate of 50 cents for each share of stock sold and located; such payment to entitle the settler to one acre-foot of water for each share of located stock and the privilege of purchasing three additional acre-feet for each such share of stock owned by the settler.

By December 24, 1901, sales of stock of the defendant corporation had been made amounting to 15,000 shares, representing 15,000 acres, and agents of the complainant had promised such purchasers that water would be delivered to them on their land on November 1, 1901. This was not done until February, 1903, when water was first delivered to the settlers and stockholders of the defendant company, at which time the canal system then constructed had only the capacity to accommodate the 15,000 acres of land for which stock had been sold. In this situation, controversies arose between the stockholders and the complainant respecting the alleged failure of the complainant to keep its contract, and respecting damages alleged to have been sustained by the stockholders by reason of such failure.

These controversies became the subject of negotiations for a settlement between the officers of the complainant and defendant which finally resulted in the instrument in controversy in this action, designated as the "Heber contract." This instrument is dated May 16, 1905, and is signed by the California Development Company by A. H. Heber, Pt., and R. T. Perry, Secy., and by the Imperial Water Company No. 5 by F. N. Chaplin, President, and Irving P. Silliman, Secretary. It recites that, for and in consideration of the mutual covenants and agreements of the parties thereto, it is agreed, among other things, that the California Development Company waives and surrenders to the Imperial Water Company No. 5 all right that the former company has as the assignee of the "Mexican Company" to sell, locate, or otherwise dispose of the unissued capital stock of the latter company, excepting from such waiver and surrender certain specified shares of stock amounting in the aggregate to 4,665 shares. In consideration of this waiver and surrender by the complainant of the unissued stock of the defendant company, the latter agreed to relieve and release the complainant from all further obligations to repair, complete, perfect, extend, or maintain the existing distributing canal system of the defendant, and to relieve and release the complainant from all obligations to construct a storm water drainage system for the defendant, or to take care of or carry off storm water that might prove injurious or destructive to the defendant's canal system; and the defendant assumed the obligation of thereafter constructing, repairing, and maintaining its own canal system or any extension thereto it might see fit to build. The instrument contained a number of other provisions binding the parties to conditions, which need not be stated here.

It is alleged in the complaint that, after the signing of said instrument, it was not referred to or acted upon by the board of directors of the complainant until in the early part of June, 1905, when it was declined, rejected, and repudiated by the complainant, and has ever since been repudiated by the complainant; that the instrument was executed without authority, and was not the contract of the complainant.

At the date of this instrument, the complainant had sold about 35,000 shares of the capital stock of the defendant company, and about 65,000 remained unissued.

It is alleged in the complaint in this action that the complainant is the owner of these unissued shares, and that they are of the value of not less than $20 per share, or a total value equal to and in excess of $1,300,000.

The object of the present action is to have the so-called Heber contract adjudicated to be of no force and effect, and that it be surrendered up and canceled, and pending the action that the defendant be enjoined and restrained from disposing of its unissued stock.

Upon the filing of the complaint in the lower court, an order was issued restraining the defendant from selling or disposing of any of its unissued stock or in any wise parting therewith except upon the order of the complainant. The order also required the defendant to show cause why an injunction pendente lite should not issue.

Upon the hearing the court refused the temporary injunction and vacated and discharged the restraining order. Thereafter the defendant filed its answer to the complaint, and the complainant filed its replication to the defendant's answer.

On a motion for a rehearing on the order to show cause, the court reinstated the restraining order, and on the final hearing had on the pleadings and proofs the court entered its decree adjudging that the contract designated as the Heber contract was void ab initio; that the defendant produce the original of said contract into court and render up the same for cancellation; that thereupon the same be marked canceled; that the temporary injunction theretofore issued restraining the defendant from disposing or transferring any of its unissued stock be made perpetual. It was further ordered, adjudged, and decreed that the defendant issue, upon the order of the complainant, in the manner and upon the terms and conditions set forth in the decree, certificates for 58,376 shares of its capital stock. The difference of 6,624 shares between the number of 65,000 unissued shares of the defendant's capital stock alleged in the complaint and 58,376 mentioned in the decree does not appear to be explained in the record before us; but, as the number of unissued shares mentioned in the decree is not made a subject of controversy, the difference mentioned is not deemed material.

From this decree the present appeal is prosecuted.

Haines & Haines, of San Diego, Cal., for appellant.

J. W. McKinley and S. V. McClure, both of Los Angeles, Cal., for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The first question to be determined in this case is whether the complainant is entitled to an enforcement of the covenant contained in the agreement between the Mexican Company and the defendant, dated March 15, 1901, the assignment of which by the Mexican Company to the complainant purports to have been ratified in the supplemental agreement between the complainant and the defendant, dated December 24, 1901. Under this covenant and assignment complainant claims the exclusive right to sell at its own price the entire unissued shares of the capital stock of the defendant corporation and appropriate the proceeds of such sale to complainant's own use and benefit. Incidental to this question is the further question whether the complainant is entitled to the enforcement of a covenant in the supplemental agreement that the capital stock of the defendant corporation shall be issued only upon the orders of the complainant. Stated in another way, the question is whether the complainant, at the time of the so-called "Heber contract," was the owner of the unissued stock of the defendant corporation. If it was not the owner of such shares of stock, the waiver and surrender of stock as provided in the contract is immaterial. If, on the other hand, it was the owner of the stock, and it had a substantial value in its hands, it will be necessary to determine whether the Heber contract was the authorized act of the corporation. Pertinent to this inquiry is the question: What does the unissued stock of the defendant corporation represent?

The defendant corporation was formed for the purpose of enabling settlers upon certain designated public lands to become stockholders in the corporation, and through the agency of the corporation to secure

for such lands, upon equal terms and at cost, the water required for irrigation, domestic, and other purposes from a corporation known in these proceedings as the "Mexican Company." The shares of stock represented the specific quantity of water the stockholders would be entitled to receive. The defendant corporation was therefore in effect a mutual company. In Wiel on Water Rights in the Western States, § 1266, such companies are referred to as "private service companies," and are described as follows:

"Mutual companies are usually such that shares of stock represent rights to specific quantities of water, and the stockholder's right to a supply rests upon his stock, and not upon his status as a member of the public; the company being formed to supply water to its stockholders only."

The general character of these corporations is to serve and promote the individual rights of the stockholders upon equal terms in securing water for the irrigation and cultivation of their land. The shares of stock in such company represent the water rights secured by the company when such rights have attached, and holders of stock in the company who are settlers upon the land hold the stock as representing the water right as appurtenant to the land upon which the water is to be used.

The complainant is a public service corporation, and as such an agent of the state in the administration of a public use. Crescent Canal Co. v. Montgomery, 143 Cal. 248, 252, 76 Pac. 1032, 65 L. R. A. 940. It was incorporated on the 23d of April, 1896, for the purpose of appropriating and diverting substantially all the water of the Colorado river at a point in California near the international boundary line between Mexico and the United States. The complainant's object in appropriating this water was to divert it through canals and ditches and deliver it to a Mexican Company organized by and acting for and on behalf of the complainant, and known as the "Mexican Company," the water to be used by the latter company for the irrigation of certain lands below the international boundary line in Mexico, and through this corporation to deliver water across the boundary line in Imperial Valley to the mutual water companies, among others, the defendant, for distribution to the lands of the stockholders of such companies.

The lands in Imperial Valley did not belong to the complainant: They were originally unoccupied desert lands belonging to the government of the United States, except such school lands in each township as belonged to the state, and except a few alternate sections in the northern part of Imperial Valley within the grant of the Southern Pacific Company.

It is conceded that the various corporations organized by the complainant and designated in this case as the "Mexican Company," and the several water corporations incorporated by it, were but instruments employed by the complainant to carry out the purpose of its organization, which was to collect from the settlers for the service of delivering the water a water rate of 50 cents per annum for each acre of land supplied by water. The right of the complainant through the Mexican Company to collect for the service of delivering the water a charge of 50 cents per annum for each acre of land supplied by water is called

a "water rate," and is not in controversy in this case. This charge is presumed to be reasonable and just for the service rendered and the aggregate of these charges a sufficient return for the capital invested by the complainant in the project. The question is: Had the complainant the authority, as a public service corporation, by and through the instrumentalities of the corporations formed for that purpose, the right, to appropriate the stock of the defendant company, and by that means compel settlers to pay a further or additional sum fixed arbitrarily by the complainant as and for a water right?

The lands included in complainant's irrigation project, including the lands at the point of diversion of the water of the Colorado river for that purpose, were originally and at the time the project was formed almost entirely public lands of the United States. We are therefore dealing with the question of a right based primarily upon section 9 of the Act of July 26, 1866, c. 262, 14 Stat. 251, 253, incorporated into the Revised Statutes as section 2339 (U. S. Comp. St. 1901, p. 1437). That section provides as follows:

"Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed: but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage."

Under the Act of March 3, 1877, entitled "An act to provide for the sale of desert lands in certain states and territories," including California (c. 107, 19 Stat. 377), there is a limitation to water rights acquired by appropriation for irrigation and reclamation of desert lands, as follows:

"And such rights shall not exceed the amount of water actually appropriated and necessarily used for the purpose of irrigation and reclamation."

This limitation is equally applicable to the use of water on all public lands for the purpose of irrigation. Atchinson v. Peterson, 20 Wall. 514, 22 L. Ed. 414; Basey v. Gallagher, 20 Wall. 682, 22 L. Ed. 452; Williams v. Altnow, 51 Or. 275, 302, 95 Pac. 200, 97 Pac. 539; Hough v. Porter, 51 Or. 318, 382, 399, 95 Pac. 732, 98 Pac. 1083, 102 Pac. 728.

[1] Under the act of 1866, the possessory water rights there protected are only such as have vested and accrued and are recognized and acknowledged by the local customs, laws, and decisions of the courts. The law of California upon this subject is found in the Constitution of the state, and in provisions of the Civil Code relating to water rights.

The first clause of article 14, § 1, of the Constitution of the state, provides that:

"The use of all water now appropriated, or that may hereafter be appropriated for sale, rental, or distribution, is hereby declared to be a public use

and subject to the regulation and control of the state in the manner to be prescribed by law."

Section 1410 of the Civil Code of California (prior to the amendment of April 8, 1911) provided as follows:

"The right to the use of running water flowing in a river or stream or down a canyon or ravine may be acquired by appropriation."

Section 1411 provides that:

"The appropriation must ·be for some useful or beneficial purpose. and when the appropriator or his successor in interest ceases to use it for such a purpose, the right ceases."

Section 1415 provides the method by which the water of a flowing stream may be appropriated. A person desiring to appropriate water must post a notice, in writing, in a conspicuous place at the point of intended diversion, stating therein: That he claims the water there flowing to the extent of (giving the number) inches, measured under a four-inch pressure; the purpose for which he claims it; the place of intended use; the means by which he intends to divert it; and the size of the flume, ditch, pipe, or aqueduct in which he intends to divert it. It is provided further that a copy of the notice must, within 10 days after it is posted, be recorded in the office of the recorder of the county in which it is posted.

Section 1416 requires diligence in the appropriation of water, and provides that:

"Within sixty days after the notice is posted the claimant must commence the excavation or construction of the works in which he intends to divert the water or the survey road or trail-building necessarily incident thereto, and must prosecute the work diligently and uninterruptedly to completion."

Section 1417 provides that "by completion" is meant conducting the water to the place of intended use.

It was clearly the scope and purpose of these statutes not only to provide for the appropriation of the waters of flowing streams within the public domain for useful and beneficial purposes, but to fix the right to such water at the place of intended use. Fellows v. City of Los Angeles, 151 Cal. 52, 59, 90 Pac. 137; Wiel on Water Rights in Western States, § 1265. This purpose has been concisely expressed with respect to the national irrigation system in the Act of June 17, 1902, c. 1093, 32 Stat. 388 (U. S. Comp. St. Supp. 1911, p. 662), providing for the irrigation and reclamation of lands in certain states and territories where it is provided, in section 8, that:

"The right to the use of water acquired under the provisions of this act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."

[2] The parties who formed the project now under consideration for the irrigation of Imperial Valley and placed the project in charge of the complainant and its subsidiary corporations were evidently fully advised as to the true purpose and meaning of these statutes. This is apparent from the various contracts entered into between the complainant and these subsidiary corporations whereby the real parties en-

deavored by skillfully drawn covenants to secure in the name of the complainant corporation the value of the water rights that would be attached to the land to be irrigated.

The first of these contracts was the contract of December 28, 1900, between the complainant and the Mexican Company. This contract contained, among other covenants, an agreement that the complainant would perpetually deliver to the Mexican Company a sufficient amount of water appropriated, owned and diverted or to be in the future appropriated, or diverted by the complainant from the Colorado river, to enable the Mexican Company to furnish water for the irrigation of lands situated in Lower California, Republic of Mexico, and in the state of California, which were irrigable by gravity from the system of canals and irrigating system to be constructed by the complainant. In consideration of this covenant, the Mexican Company assigned and transferred to the complainant all right which the Mexican Company had in the stock of Imperial Water Company No. 1, and all right which it had to receive any of the moneys which would otherwise be due and payable to the Mexican Company from the sale of stock of that company. It was further agreed that the Mexican Company would make like assignments in the future of all rights which it might acquire under similar contracts made with other water companies for the sale of the stock of such companies, or the proceeds to be derived therefrom.

The second of these contracts was that of March 15, 1901, between the Mexican Company and the defendant corporation. In this contract the previous agreement between the complainant and the Mexican Company was recited, together with the further recital, and as an inducement to the covenants of the contract, that it was a corporation formed for the purpose of obtaining water from the Mexican Company, and supplying the same at cost to the stockholders only upon certain lands situated within certain exterior boundaries mentioned and described in its articles of incorporation.

It was thereupon agreed by the Mexican Company to deliver annually on demand to the defendant company four acre-feet of water for each share of stock which might have been issued and located upon lands situated within the boundaries of the lands to be supplied with water by the defendant. In consideration of this covenant, the defendant agreed that the Mexican Company should have the exclusive right to sell the entire shares of the capital stock of the defendant company, and the Mexican Company should receive for its sole use and benefit all moneys obtained by it from such sale of the stock of the defendant company; that the defendant would locate all stock sold by the Mexican Company upon the lands to be selected by the purchasers of such company or the order of the Mexican Company at the time of the sale. It was further provided that such stock should be located within the exterior boundaries of the lands to be irrigated by the defendant and described in its articles of incorporation.

In consideration of these agreements, the defendant agreed that it would pay the Mexican Company 50 cents per annum for each share of its stock sold and located, and that the payment of such sum should

entitle the defendant to one acre-foot of water for each share of stock sold and located. It was further agreed that the defendant should have the right to purchase from the Mexican Company three additional acre-feet of water per year at the rate of 50 cents per acre-foot for each share of stock sold and located as provided in the contract.

The third contract is that between the complainant and defendant, dated December 24, 1901. In this contract there are a number of covenants. Among others, the defendant agreed that it would issue any portion of its unissued capital stock at any time upon the order of the complainant, and that none of its unissued capital stock should be issued except upon such an order. It was further provided that no stock in the defendant corporation should be thereafter issued, sold, or disposed of except to persons who owned or who had acquired some equitable interest in land lying in the territory designated in defendant's articles of incorporation, and such to be irrigated by the waters to be furnished by the complainant. It was further provided that all such stock so to be issued, sold, or disposed of would at the time of its issue be located upon and be made appurtenant to specific lands lying within the prescribed boundaries then owned by, or an equitable interest in which was owned by, the party to whom the stock was issued, and the lands upon which such stock was located should be described and designated in the certificate of stock issued to represent the same; one share of stock being apportioned to each acre of land.

These contracts were far short of transferring to the complainant the water rights represented by the unissued shares of the defendant's capital stock. When these contracts were made, the directors of the defendant corporation were the mere agents of the complainant for the formation of the corporation. The lands described in the articles of incorporation were at that time unoccupied public lands of the United States or school lands of the state, and there was no irrigation system in actual existence for the district. In the agreement between the complainant and the defendant dated December 24, 1901, it is expressly recited that no system of canals or distributing systems has been constructed for the delivery of water to the present stockholders of the defendant company. The work did not come within the requirements of sections 1416 and 1417 of the Civil Code, and no rights had attached. The whole project, so far as these lands were concerned, was a scheme devised by the parties behind the project to appropriate to themselves the value of the water rights to all the irrigable land in Imperial Valley.

The defendant corporation was a mutual company formed to secure water for the settlers in the district, and, when the stage was reached that it issued stock to settlers upon lands within its district, these shares represented the water rights attached to the lands upon which the settlers had located. The shares of unissued stock which are the subject of the present controversy represented merely the prospective water rights upon lands of the settlers who should thereafter become stockholders in the company. While the stock was unissued, it was manifestly held in trust by the defendant corporation for the mutual

benefit of those who were, and those who should become, stockholders. In our opinion the defendant corporation, holding its unissued stock in trust for actual settlers who should become stockholders of the company, had no authority to make a contract with the complainant whereby it transferred to the complainant, without consideration, the right to squeeze out of the stock all there was of value in it before delivering it to the settler.

There is a covenant contained in the supplemental agreement between the complainant and the defendant to be noticed in this connection. It is provided that no stock in the defendant company should be issued or sold in the future, except upon there being paid into the treasury of the defendant at the time of such issue $1 in money for each share of stock so issued or sold. It is sufficient to say, with respect to this covenant, that it was not the consideration for the covenant granting to the complainant the exclusive right to sell the entire unissued shares of the capital stock of the defendant company, which at that time the complainant had fixed at $20 per share, and the sales of which were to be for complainant's sole use and benefit. This leaves us to find the consideration in the so-called water right which the complainant claims to have acquired by the delivery through the Mexican Company of the water required to irrigate the lands to be settled upon by the stockholders of the defendant corporation.

Is this a consideration that the law will recognize?

We think not. In this case the land to be irrigated was not occupied, and the water right did not attach. When that time should arrive, the water right would attach to the land by operation of law, and not by virtue of the contract entered into between the complainant and the defendant. The complainant would have no water right to convey. There was therefore no consideration for the contract. We are fully advised as to the fact that voluntary contracts for the purchase of water rights from canal companies, whose works had been completed and were in operation, have been sustained by the courts in this state; but such cases must be carefully considered in the light of the facts of the particular case. The law of water rights applicable to the conditions prevailing in the Western States is being rapidly developed by legislation, by the courts, and by text-writers; but it has not progressed far enough to furnish finger posts for all the byways of water litigation, unless we constantly bear in mind certain well-established general principles, among others, that it is the purpose of the law in regulating water rights in the Western States to avoid monopolies. As said by the Supreme Court of California in Merrill v. Southside Irrigation Co., 112 Cal. 426, 433, 44 Pac. 720, 722:

"The evident intent of the framers of our Constitution was to strike a blow at the monopolies which had grown up out of the sale, rental, and distribution of water, and by declaring such a use a public use to bring it within the control of the local authorities in municipalities where the burdens of the system were most onerous."

An onerous condition growing out of a monopoly and imposed by a public service corporation engaged in distributing water before such distribution could be made cannot, therefore, be considered a sufficient

consideration for the acquisition of a right guaranteed by law, even though the transaction is voluntary. But we do not look upon the contract in this case as a voluntary contract in the sense in which that term is used in the cases where such contracts have been upheld. It is true that no one is compelled to settle upon the lands in Imperial Valley, but the right to settle upon such lands is free and open to all, and the complainant had no right as a public service corporation to establish a monopoly of all the water available for the irrigation of the lands in Imperial Valley in advance of settlement, and then, by means of a contract between itself and its agents, burden its public service in a manner not contemplated by law. Such a contract is not a voluntary contract on the part of those for whose benefit the water has been dedicated by law.

It will not be necessary to review the cases where the question of water rights has been discussed. In this court its last expression is found in Boise City Irrigation & Land Co. v. Clark, 131 Fed. 415, 65 C. C. A. 399. That case arose in the state of Idaho, whose Constitution provides, substantially as does the Constitution of the state of California, that the use of the waters of the state appropriated for sale, rental, or distribution is a public use, and the right to collect compensation therefor a franchise, which cannot be exercised except by authority of and in the manner prescribed by law. Judge Ross, speaking for the court, and following his decision in San Diego Land & Town Co. v. City of National City (C. C.) 74 Fed. 79, and the case of Stanislaus County v. San Joaquin & King's River C. & I. Co., 192 U. S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406, held that an irrigation company appropriating water for sale under the statute had no authority to make private contracts for so-called perpetual water rights, and that such contacts were void. It appears that there was an inequality in these contracts; but their invalidity was not based upon that ground, but because, as in the San Diego Case, they were contrary to the terms of the public use provided by the Constitution and the laws of the state. This decision was rendered in May, 1904.

Our attention has been called to the case of Wilterding v. Green, 4 Idaho, 773, 45 Pac. 134, rendered by the Supreme Court of Idaho in May, 1906. It is suggested that this case seemed not to have been called to the attention of this court when the Boise City Case was submitted. The intimation is that, had the court been familiar with the Idaho case, the decision of this court in the Boise City Case would have been different. We find nothing, however, in the Idaho decision, as now urged upon our attention, that makes us doubt the correctness of our former decision. Indeed, we are rather more firmly convinced that we are right in that decision. The Idaho case in the Supreme Court of that state was this: The plaintiff was the owner of 40 acres of land which could be irrigated from defendant's canal or ditch and not by any other means. The land had not been theretofore irrigated. Defendant was a public service corporation, the owner and in charge of the irrigation system carrying a surplus of water not sold, rented, or otherwise disposed of. Plaintiff applied to the defendant for water to irrigate his land, and tendered with the application

the sum of $60, or $1.50 per acre, as compensation therefor. Defendant refused and demanded $10 per acre for a perpetual water right and $1 per annum for a water rate. Plaintiff brought action for mandamus. Defendant demurred to the complaint. The demurrer was overruled. Thereupon defendant answered, and plaintiff demurred to the answer, which was sustained. Defendant declining to answer further, judgment was entered in favor of the plaintiff. The Supreme Court held that the district court was authorized by the statute of the state to determine what, under all the circumstances, was a reasonable compensation, and what would be reasonable terms for the use of water furnished by the defendant; but the case presented to the court by the pleadings required the court to compel the defendant to furnish him with water at $1.50 per acre arbitrarily, without giving the court the opportunity of determining, after due consideration of all the facts presented by proper evidence, whether said sum was a reasonable compensation or not. The judgment of the lower court was accordingly reversed, with instructions to sustain the demurrer to the complaint, but with leave to amend so that the reasonableness of the rate could be determined by the court. The defendant's demand that it be paid $10 per acre for a perpetual water right, and in addition $1 per annum for a water rate was not sustained, but, as will be seen presently, was expressly denied.

Now, it is contended that because the Idaho court in its decision referred to the difference between the provisions of the Constitution of Colorado providing that the water of every natural stream is declared to be the "property of the public," while that of Idaho provides that the use of appropriated waters is declared to be a "public use," and the court had said that the doctrine of the Colorado court that the canal or ditch owner was a mere "common-carrier" could not be predicated upon the provisions of the Idaho Constitution, holding that the Idaho Constitution was dealing only with the use of water and not with the property rights of appropriators, the conclusion is drawn that the decision of this court in the Boise City Case is in conflict with the Idaho Case because this court held that certain so-called perpetual water rights growing out of private contract were contrary to the terms of the public use provided by the Constitution of the state. In our opinion there is no such conflict, and this opinion appears to be fully sustained by a paragraph in the opinion of the Supreme Court of Idaho applicable to the present case, as follows:

"It can hardly be presumed that any court would give recognition to a rule or policy on the part of the ditch or canal owners by which the company could assess against the consumers the cost of the construction of the canal, and, in addition thereto, an annual rental, such as is exacted in this case."

See, also, San Joaquin & King's River C. & I. Co. v. The County of Stanislaus (C. C.) 191 Fed. 875, where the authorities upon this question are reviewed.

In the late cases of Leavitt v. Lassen, 157 Cal. 82, 106 Pac. 404, 29 L. R. A. (N. S.) 213, and Lassen Irri. Co. v Long, 157 Cal. 94, 106 Pac. 409, the Supreme Court of the state of California denied the

validity of certain contracts wherein the owner of an irrigation system undertook to reserve from the sale of the system permanent preferential water rights to irrigate certain lands. Mr. Justice Henshaw, speaking for the Supreme Court in the first case, said:

"Treating Leavitt's appropriation as being wholly and entirely for public use, he (the owner of the system) was but an instrumentality for the distribution of the waters which he gathered to such members of the public as might apply for them and pay to him the legal charge for the service that he rendered. As the agent of such a public use, he had no power whatsoever to reserve to himself for his private purposes any part of this water."

In the second case, Mr. Justice Henshaw, again speaking for the court, said:

"Waiving all minor objections, had Purser (the purchaser of the irrigation system) the power so to burden his public trust with this perpetual private right? Purser, it is to be remembered, held all of these waters as an appropriator for sale, rental, and distribution under the Constitution of 1879. He was but the purveyor of this public use, the agent in the execution of this public trust. If, by any method, however devious, there can be carved out of this public trust such a private right, it must obviously result in the destruction of the public use itself."

The language here used is peculiarly applicable to the transaction we are now considering. If the complainant in this case has devised a method whereby it can carve out of the public trust it is engaged in administering, and secure to itself upon its own arbitrary valuation the entire value of the water rights of the settlers in Imperial Valley, then the trust is at an end, and a monopoly of both land and water has been firmly established in that region.

We do not think a court of equity can lend its aid to the accomplishment of such a result. Pope Mfg. Co. v. Gormully, 144 U. S. 224, 236, 12 Sup. Ct. 632, 36 L. Ed. 414. It follows that, in our opinion, the covenant in the agreement between the Mexican Company and the defendant, dated March 15, 1901, and assigned to the complainant by the Mexican Company, and ratified in the agreement between the complainant and defendant, dated December 24, 1901, purporting to grant to the complainant the exclusive right to sell the entire shares of the capital stock of defendant, and that the complainant should receive for its sole use and benefit the proceeds of such sale, is void for want of consideration and for lack of authority on the part of the defendant corporation to make such an agreement.

This conclusion obviates the necessity of considering whether the so-called Heber contract was authorized by the complainant corporation. The covenants in the agreements referred to being void, the complainant had no such interest in or control of the unissued stock of the defendant corporation that it could make its surrender or the right it represented the subject of waiver and contract.

The decree of the court below is, accordingly, reversed, with instructions to dissolve the injunction and dismiss the bill of complaint.

GILBERT, Circuit Judge (dissenting). The decision of the case in the court below was based upon the construction placed by the Supreme Court of California upon the state Constitution of 1879 and

the statutes of the state passed pursuant thereto as expressed in the leading case of Fresno Canal & Irrigation Co. v. Park, 129 Cal. 437, 62 Pac. 87, and as recognized by this court in San Diego Flume Co. v. Souther, 90 Fed. 164, 32 C. C. A. 548, and Id., 104 Fed. 706, 44 C. C. A. 143. I am unable to agree that the court below erred therein or in reaching the conclusion that the decision in Fresno Canal & Irrigation Co. v. Park has not been overruled or modified by the subsequent decisions in Leavitt v. Lassen Irrigation Co., 157 Cal. 82, 106 Pac. 404, 29 L. R. A. (N. S.) 213, or Lassen Irrigation Co. v. Long, 157 Cal. 94, 106 Pac. 409. It is not held, in either of those cases, that water rights may not be sold by public service corporations, or that contracts may not be voluntarily made by and between such corporations and the consumers of water for the supply of water to such consumers in the districts for which water has been appropriated. In the first of those cases, all that was held was that a water company, having water appropriated under the Constitution of 1879 for sale or rental, is without power to confer any preference right on one consumer over another to the use of any part of its water, and incidentally the court sustained the validity of a contract between the water company and a consumer, by holding that where the water company furnished to a consumer water under a rate fixed by it, and the consumer refuses to pay anything and claims the right to use the water without charge, his act amounts to a repudiation of the contract and ends his rights thereunder. The court said:

"It does not follow that a water company may not make specific contracts with individual consumers which are within the purview of the Constitution and within valid legislative enactments regulating the public use. This is precisely as decided by Fresno Canal Co. v. Park, 129 Cal. 437 [62 Pac. 87]."

In Lassen Irrigation Co. v. Long, it was held that the continued refusal of one to whom water was being furnished under a contract to pay therefor is a breach of the contract, justifying the water company in repudiating the contract and suing thereafter, in the absence of a legally established rate, for the reasonable value of the service rendered.

Recognizing the binding force of the decisions of the Supreme Court of California, the court below held, in substance, that the appellant, a mutual water company, necessarily parted with its right to select its own stockholders, since it was of the essence of the scheme that any qualified entrymen within the district should be entitled to receive water upon payment of the established rates, and that there is nothing illegal in a contract between a water company and a consumer which provides for an initial charge for the perpetual right to water and a further charge based upon the quantity of water furnished. This is in harmony with what was said in Fresno Irrigation Co. v. Park:

"Something is said by appellants about the money paid by their predecessors at the date of the contract, which is called by them a 'bonus'; but it is difficult to see how that matter can be brought into view, as the only moneys herein involved are the early rentals; and, even if it were invoked here, the payments of part of the rental in advance would certainly not vitiate the contract."