[S. F. No. 3890. In Bank.—January 23, 1908.]

## STANISLAUS WATER COMPANY, Appellant, v. S. BACHMAN, Respondent.

WATER-RIGHTS—EXECUTORY CONTRACT TO SELL WATER FOR IRRIGATION—
PLACE OF RECORD—CONSTRUCTIVE NOTICE.—An agreement made by
a water company with the owner of land, to furnish to him, his heirs
or assigns, sufficient water for irrigation thereof at ten dollars per
acre, with interest, apportioned and commuted in yearly part payments until paid and settled in full, and to furnish water thereafter
at a specified yearly rental, is not to be classed as a grant to be
recorded in the book of "Deeds," but is an executory contract for the

sale of water, which was properly recorded in a book of "Miscellaneous Records"; and such record imparted constructive notice of its contents.

ID.—CONTRACT FOR INTEREST IN REAL PROPERTY — EASEMENT APPURTENANT TO LAND—PURCHASE OF PART UNDER FORECLOSURE.—The contract for the sale of the water-right was for the sale of an interest in real property, and when the water-right was fully acquired by the vendee, it became an easement appurtenant to his land according to its acreage, and would pass, as an incident, to a purchaser of part thereof, made subsequent to its acquisition, under foreclosure of a mortgage by the vendee, though executed prior thereto.

ID.—RIGHTS OF PURCHASER.—The rights of such purchaser under foreclosure of the mortgage against the vendee, are the same under the original agreement, as to the acreage purchased, as those of the original vendee.

ID.—FORECLOSURE OF MORTGAGE ON CANAL—VENDEE NOT A PARTY.—The purchase by the plaintiff water company, under the foreclosure of a mortgage, of the canal made by the water company which executed the recorded agreement, if executed prior thereto, could not conclude the rights of the vendee, if not made a party to the foreclosure, and whatever rights it may have in the canal under such foreclosure against the mortgagors, it took subject to the rights of the vendee under the recorded contract.

ID.—WATER FLOWING IN CANAL FOR IRRIGATION—REAL PROPERTY.—The right to water which is diverted from a stream into a canal for the purpose of conducting it to lands for irrigation, is real and not personal property; and the rights of owners of lands to have the water flow from the canal through a lateral ditch for irrigation, is a servitude upon the ditch and canal, as an appurtenance to the land irrigated, and is real property.

ID.—COVENANTS RUNNING WITH LAND.—Where the agreement declared that "this contract shall have the force and effect of a covenant running to and with the land of the party of the second part, and the canal of the party of the first part," the covenant of the water company making the agreement as to water-rights was not personal, but was an agreement for the sale of real property, which is binding upon its successor in interest, who took with notice of the agreement.

ID.—PERFORMANCE OF CONTRACT BY VENDEE—RIGHT TO YEARLY RENTAL BY PART PURCHASER OF LAND.—The agreement being sufficiently certain in its terms, and having been fully executed as a contract of purchase of the water-right by the original vendee, his successor in interest in part of the land, is entitled under the agreement to the yearly rental per acre against the plaintiff company, which cannot recover against him any greater sum.

ID.—PUBLIC USE OF WATER FOR IRRIGATION—EFFECT OF CONSTITUTION—RIGHT OF LANDOWNER TO ACQUISITION OF RIGHT.—If the water-

right of the water company making the contract was in private ownership and use when the constitution of 1879 was adopted, it could not have the effect to dedicate its property to public use without the consent, express or implied, of its owners. But, if it were otherwise, the constitutional provision as to the public use of water supplied for irrigation, is not intended to prevent a landowner from acquiring and attaching to his land, a right to the permanent use of water for its irrigation, subject only to the condition that the state may regulate and control the use.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. M. C. Sloss, Judge.

The facts are stated in the opinion of the court.

J. W. Dorsey, W. E. Cashman, James F. Peck, and W. F. Williamson, *Amicus Curiæ*, for Appellant.

Vogelsang & Brown, and Samuel C. Wiel, for Respondent.

SHAW, J.—The plaintiff sued the defendant to recover nine hundred and twenty dollars alleged to be due for water sold and delivered by the plaintiff to the defendant for the irrigation of four hundred acres of land, or at the rate of $2.30 per acre. The defendant admitted the receipt and use of the water on the land, and offered to allow judgment in favor of plaintiff for six hundred dollars, or at the rate of $1.50 per acre. The case depends on the question whether or not the plaintiff can charge more than $1.50 per acre per year for water for irrigation purposes. The court below held for the defendant, and gave judgment for plaintiff for six hundred dollars, without costs.

The claims of the defendant are founded upon an agreement between one Threlfall, his predecessor in the ownership of the four hundred acres of land, and a corporation known as the Stanislaus and San Joaquin Water Company, the predecessor of the plaintiff in the ownership of the water and water system in question. The said Stanislaus and San Joaquin Water Company was the owner of water-rights in the Stanislaus River and a canal whereby the water was conducted through Stanislaus County, and it was engaged in the business of distributing and selling the water to farmers for irrigation purposes. Threlfall was the owner of a large tract

of land.  The following is a statement of the parts of the agreement that are material to the case:—

The company agreed to "furnish through its canal from the Stanislaus River," to Threlfall, "his heirs or assigns, during each and every year, for the term hereinafter mentioned, for the purpose of irrigating a tract of four hundred and sixty-one acres of land, . . . a flow of water sufficient to fully irrigate said land as often as necessary during each year of said term."  The land described consisted of ten quarter sections, comprising about sixteen hundred acres, and the four hundred and sixty-one acres was described as all those portions of the larger tract "lying north of Little Johns Creek and south of Myrtle Creek."

The water was to be used for irrigating purposes only on said land, and was to be delivered by the company on the land in such manner as to make it available for use thereon. "The headgates, weirs and other arrangements or devices through which the water shall be drawn from said canal" were to be made and placed in position by the company at its own expense, and it was to fix and control the manner of supplying the water.

Threlfall agreed to pay the company "the sum of ten dollars per acre for each and every acre of said land" to which the company agreed to furnish water, with interest on such sum at six per cent per annum, "principal and interest apportioned and commuted as follows: On the first day of November after the delivery of water under the contract . . . the sum of eighty cents for each and every acre of said land, and on the first day of November thereafter for the period of twenty years thereafter, a like sum, making in all twenty payments on each and every acre of said land aforesaid, which shall be in full payment of the amount provided to be paid herein," or Threlfall had the right at any time to "make a cash settlement in whole or in part of the amount unpaid, by paying the principal sum still unpaid and the interest accrued" to the time of settlement.

Threlfall also agreed to pay, in addition to the above sums, the sum of $1.50 per acre per year upon each acre of the land, "as a water rental therefor," to be paid on November 1st of each year perpetually.

The ninth clause of the agreement contained the following: "The said parties agree to and with each other that this contract shall have the force and effect of a covenant running to and with the said land of the party of the second part (Threlfall) and the canal of the party of the first part" (the company).

The contract was executed on the eighteenth day of June, 1896. The land to be irrigated was situated some eight or ten miles from the canal mentioned in the agreement, or from the point thereon at which the water was to be diverted therefrom. Under a subsequent contract with the company, Threlfall constructed for the company a lateral ditch leading from the point of diversion in the canal to his lands, and the company accepted this work as full payment of the ten dollars per acre agreed to be paid by Threlfall on the four hundred acres of land for which it subsequently supplied water. This arrangement appears to have been understood as a release of both parties from the operation of the contract and the obligations thereof, with respect to the remaining sixty-one acres mentioned in the agreement. The company took possession of the lateral ditch and thereafter used it to convey water from its main canal to the lands of Threlfall and other lands in the vicinity.

The Stanislaus and San Joaquin Water Company had executed a mortgage on July 26, 1895, upon all of its property, including the said main canal, and all lateral ditches and appurtenances of every character connected therewith. This was prior to the contract with Threlfall and before the construction of the lateral ditch leading to his land. This mortgage was foreclosed, and on December 17, 1898, the mortgaged property, including said lateral ditch, was sold at the foreclosure sale to J. Dalzell Brown, and the deed thereunder was afterward executed to the plaintiff, as his successor. Neither Threlfall, nor Bachman, the defendant, were parties to the foreclosure suit.

In 1893 and 1894 Threlfall executed certain mortgages on his land, which were foreclosed in 1898, and Bachman obtained title to said land by deed under the foreclosure decree. Neither the Stanislaus and San Joaquin Water Company, nor the Stanislaus Water Company, were parties to that action of foreclosure.

During the year 1900 Bachman was the owner of the four hundred acres of land and the plaintiff was the owner of the canal and water system. It regularly supplied water to Bachman for the irrigation of the four hundred acres of land during that year. The court finds that the reasonable value of the water so supplied, independent of the terms of the contract, was $2.30 per acre, or nine hundred and twenty dollars for the land supplied. This, it may be observed, was substantially the same as the value fixed in the contract, being equal to the $1.50 annual rental and the eighty cents for the annual payment agreed on. The foregoing are the principal facts upon which the rights of the parties depend.

1. The water-right agreement between the Stanislaus and San Joaquin Water Company and Threlfall was on June 26, 1896, recorded by the recorder of Stanislaus County in a book kept by him in the recorder's office and designated as volume 6 of Miscellaneous Records. This is one of seven books of the same designation, which are kept in the said office. Ever since the year 1854 it has been the custom in said county to record in these books, so designated, instruments filed for records of the classes known as agreements, mining locations, bills of sale, water-rights, water contracts, certified copies of decrees confirming sale, articles of copartnership, assignments for benefit of creditors, assignments of sheriff's certificates of sale, bonds for deeds and agreements for sale of real estate, and it does not appear that in that county any instrument of either of these classes has ever been recorded elsewhere than in said Miscellaneous Records.

The substance of the agreement has been, in part, stated. There were other clauses further showing its complex character. The fifth provided that Threlfall might use water on only one fourth of the land the first year, one half the second year, three fourths the third year, and thereafter on all the land, paying rent only on the part used. By the seventh clause Threlfall granted to the company a permanent right of way over any land he owned, for the canal of the company, and Threlfall was granted the right to use water from such canal for domestic purposes and to water stock, and to plant trees by the canal. The eighth provided that if, from causes not within its control, the company was unable to furnish the water, it should not be liable for the failure

CLII Cal.—46

and Threlfall should pay rent only for what water he received. Neither party was to be liable until delivery of water began or was tendered.

It is claimed by the plaintiff that in legal effect this contract was a grant of real property, that is, of a right to demand and receive water for the irrigation of land, and that it should have been recorded in the book of deeds, instead of in the miscellaneous records, and that under the rule announced in *Cady* v. *Purser,* 131 Cal. 552, [82 Am. St. Rep. 391, 63 Pac. 844], the record in the latter imparted no constructive notice of its contents to the plaintiff as a subsequent purchaser of the canal system and water-rights of the Stanislaus and San Joaquin Water Company, and that, as it bought without actual notice thereof, it took the canal system and all the water-rights, free from the obligations, burdens, easements, or servitudes imposed by that contract. On the other hand, plaintiff says, if it is not such a grant, then it is a mere personal agreement to sell and deliver water from year to year, binding only on the parties, and the plaintiff is free to demand and receive, for water it may sell and deliver, its full reasonable value without regard to payments made by Threlfall, under the contract, to plaintiff's predecessor.

Section 124 of the County Government Act (Stats. 1897, p. 484), as it stood at the time this agreement was recorded, provided that the recorder must "record separately, in large and well-bound separate books, in a fair hand: 1. Deeds, grants, transfers and mortgages of real estate, releases of mortgages, powers of attorney to convey real estate, and leases which have been acknowledged and approved. 2. Mortgages of personal property." Then follow ten additional designated classes of instruments, the section closing with class "12. Such other writings as are required or permitted by law to be recorded."

The instrument in question does not come within either of the classes designated as "deeds, grants and transfers of real estate." No lawyer would call it a deed or a grant. No part of it is in the form usually adopted for such instruments. With respect to the rights secured to Threlfall under the agreement, it would not, in the ordinary use of language, be called a transfer of real estate. It is an executory agreement to sell and deliver, or, to use its words, "to furnish"

water to Threlfall from year to year for the irrigation of
his land. Such an agreement confers a right to receive water
upon the terms agreed on, and this is no doubt a right in
real property, as will hereinafter appear, but it does not
necessarily follow that the instrument by which it is conferred
constitutes a present grant or transfer. Any agreement to
sell or convey real estate gives the vendee a right which is an
interest in real property, but such instruments are not grants
or transfers, and no one would expect to find them recorded
in a book set apart for deeds, grants, and transfers. It is
a matter of common knowledge that such instruments are
usually recorded in a book designated as a Miscellaneous
Record. The evidence shows that it has been the custom in
Stanislaus County, ever since its organization in 1854, to
record water contracts and other agreements of like char-
acter to that in question here, in the books of Miscellaneous
Records. We think it has always been the custom throughout
the state to so record them. It must be admitted that a
document so composite in its elements is better described as
an instrument of miscellaneous character than as a grant
or transfer of real estate, and that one would naturally look
for it in the Miscellaneous Records. We think that record
was the proper one in which to record it. We do not mean
to imply by this, that the record of such an instrument might
not be effective for some purposes, if made in some other
book. Courts should not be technical in such a matter where
the instrument in question is so complex and difficult to
classify as the one in question. The rights of parties under
the Recording Act should not depend on the ability to properly
determine the character of such an instrument.

The mortgage of the water system of the Stanislaus and
San Joaquin Water Company, by foreclosure whereof the
plaintiff obtained title thereto, is not set forth in the record,
and hence we cannot determine whether or not it was con-
templated that that company, as a going concern, was thereby
authorized to make contracts, such as that with Threlfall,
whereby it might obtain funds to pay the principal and inter-
est of the mortgage, and by which the mortgagee would be
bound. But if that mortgage was paramount to Threlfall's
rights, it could not be enforced against him without a fore-
closure to which he was a party, if suit was begun, as is

conceded here, after his contract was recorded. He was not made a party thereto and the consequence is that the plaintiff holds the canal system and the waters thereof subject to the rights of Threlfall and his successors in interest, at least until those rights have been terminated by foreclosure proceedings to which he, or they, are parties.

2. The rights of Bachman under the agreement are the same as those of Threlfall.

It is immaterial that the mortgages of Threlfall's land, under which Bachman acquired title, were executed before Threlfall obtained the water-right. The water-right, when acquired, became an easement appurtenant to the land (*Farmer* v. *Ukiah Water Co.*, 56 Cal. 13) and passed with it, upon the foreclosure sale in the same manner as any other appurtenance or fixture passes with the title and possession of land. (Civ. Code, secs. 1084, 1104; *Cave* v. *Crafts*, 53 Cal. 140; *Farmer* v. *Ukiah Water Co.*, 56 Cal. 13; *Cross* v. *Kitts*, 69 Cal. 221, [58 Am. Rep. 558]; *Smith* v. *Corbit*, 116 Cal. 591, [48 Pac. 725].) It was an incident of the land and would pass as such by a conveyance of the land, without express mention and without any reference thereto, such as by the use of the word "appurtenances" or otherwise. A conveyance of land upon a foreclosure sale must, of necessity, at least as between the parties to the mortgage, carry with it a water-right appurtenant to the land acquired and used by the mortgagor for the benefit of the land, although obtained after the execution of the mortgage and before the sale on foreclosure. We are cited to no authority for or against this proposition, and have not succeeded in finding any relating to it, but from the nature of the case it must be correct. Fixtures subsequently attached to mortgaged land pass to the purchaser at foreclosure sale, although not mentioned or referred to in the mortgage. (*Merritt* v. *Judd*, 14 Cal. 72; 2 Jones on Mortgages, sec. 1657; 1 Am. & Eng. Ency. of Law, 255.) The same rule applies to improvements made by the mortgagor on mortgaged land. (1 Jones on Mortgages, secs. 147, 681; *Union Water Co.* v. *Murphy Flat Co.*, 22 Cal. 231; *Tibbitts* v. *Moore*, 23 Cal. 215.) We are unable to perceive any material difference in principle, in this respect, between fixtures and improvements attached to or erected upon land, and a water-right attached to land as an appurtenance, such

as that here involved, and we hold that it is governed by the same rules.

This principle probably applies also to the right of the Stanislaus Water Company to the lateral ditch built for the Stanislaus and San Joaquin Water Company from the main canal to Threlfall's land. It was used in connection with the canal for its benefit, and it was, therefore, an appurtenance to the canal. Although not in existence at the time the canal and water system were mortgaged, it became a part of the system as soon as it was constructed. It is not necessary to this case to determine whether or not it passed to the plaintiff by the foreclosure sale under the prior mortgage. The two interested parties appear to have assumed that it did. It was expressly included in the foreclosure sale and in the deed to the plaintiff, and the plaintiff took possession of it accordingly and used it to carry to the plaintiff's land the water for the rental of which it here claims compensation. Under these circumstances it is immaterial, in this action, how it acquired title to the lateral.

3. We have assumed that the right conferred on Threlfall by the agreement with the Canal Company was real property. This is controverted by plaintiff and its argument is, for the most part, founded on the assumption that it was either personalty, or that the agreement constituted nothing more than a personal covenant of that company which does not bind the plaintiff, as its successor. We think neither of these propositions is correct.

That water in its natural situation upon the surface of the earth, whether as a flowing stream, as a lake or pond, or as percolations in the soil, is real property, will not be disputed. That it may become personalty by being severed from the land and confined in portable receptacles is also evident. There is a remark in the opinion of Field, J., in *Heyneman* v. *Blake*, 19 Cal. 595, which has apparently given rise to the notion that when water is confined in artificial channels it thereupon becomes personal property. The learned jurist there says: "Water when collected in reservoirs or pipes and thus separated from the original source of supply is personal property, and is as much the subject of sale—an article of commerce—as ordinary goods and merchandise." The law then authorized the formation of corporations to

engage in "any species of trade or commerce." The corporation in question was organized to engage in the business of distributing and selling water to the inhabitants of a city for their use. The question under discussion was the authority to organize such a corporation under that law. The language quoted from the opinion is apt for the disposition of the question to which it was addressed, but it is by no means tantamount to a decision that water becomes personalty as soon as it is diverted from its natural channel or situation. No such question was involved in that case. The earth is composed of land and water, and the water is not different in this respect from other material substances composing a part of the earth. Trees, when felled and cut into logs and lumber; coal, iron, gold, and silver, when taken from the mine; rocks, when quarried from their bed; oil, when pumped from the depths; clay, when burned into bricks or converted into cement, all are real property before the change, but upon severance forthwith become personalty. The business of collecting water in reservoirs, conducting it in pipes to houses of a city, and there selling and delivering it to the occupants of such houses is a process of severing the water from its connection with the earth and changing it into personal property. The person or corporation engaged therein is as much engaged in trade and commerce as is the miner, the oil producer, the brick maker, or the cement manufacturer who sells his product. But the substances in which these persons deal do not become personalty until the severance is complete. The right to the water in the pipes and the pipes themselves usually constitute an appurtenance to real property in such cases, and, if so, the water usually retains its character as realty until severance is completed by its delivery from the pipes to the consumer. The right in water which has been diverted into ditches or other artificial conduits, for the purpose of conducting it to land for irrigation, has been uniformly classed as real property in this state. "The right to water must be treated in this state as it has always been treated, as a right running with the land and as a corporeal privilege bestowed upon the occupier or appropriator of the soil; and as such, has none of the characteristics of mere personalty." (*Hill* v. *Newman,* 5 Cal. 446, [63 Am. Dec. 140].) The right to have water flow from a river into a

ditch is real property; and so also is the water while flowing in the ditch. (*Lower K. R. W. D. Co.* v. *Kings River etc. Co.,* 60 Cal. 410.) A wrongful diversion of water flowing in a ditch is an injury to real property. (*Last Chance etc. Co.* v. *Emigrant D. Co.,* 129 Cal. 378, [61 Pac. 960].) The right to take water from a river and conduct it to a tract of land is realty. (*South Tule etc. Co.* v. *King,* 144 Cal. 454, [77 Pac. 1032].) The right to have water flow through a pipe from a reservoir to and upon a tract of land is an appurtenance to the land. (*Standard* v. *Round Valley Co.,* 77 Cal. 403, [19 Pac. 689].) An undivided interest in a ditch and in the water flowing therein is real property. (*Hayes* v. *Fine,* 91 Cal. 398, [27 Pac. 777].) A ditch for carrying water is real estate. (*Smith* v. *O'Hara,* 43 Cal. 376; *Bradley* v. *Harkness,* 26 Cal. 77.) And where one person has water flowing in a ditch and another has the right to have a part of such water flow from the ditch to his land for its irrigation, the right of the latter is a servitude upon the ditch and is real property. (*Dorris* v. *Sullivan,* 90 Cal. 286, [27 Pac. 216].) So, in the case at bar, the right of Threlfall and his successor, Bachman, under the agreement, to have the water flow from the plaintiff's canal through the lateral ditch, to the land, for its irrigation, is a servitude upon the ditch and upon the canal, is an appurtenance to the land, and is real property.

4. We think it is also clear that the effect of the agreement was to confer upon Threlfall a right to such portion of the water flowing from the Stanislaus River through the canal of the company as should be required for the full irrigation of the land, and to have the canal and ditch used for the purpose of conducting the same to the land, and that it is more than a mere personal covenant on the part of the company.

The agreement declares in effect that the obligations thereby imposed on the company shall have the force and effect of a covenant running with its canal. Covenants running with real property bind the assigns of the covenantor in the same manner as if they had personally entered into them. (Civ. Code, sec. 1460.) A lien is a charge imposed upon specific property by which it is made security for the performance of some act. (Civ. Code, sec. 2872.) If it had been provided that the agreement to furnish the water should bind the canal

of the company there would have been created thereby a lien on the canal for the performance of the act ·of furnishing the water as agreed. (*Fresno Canal Co.* v. *Rowell,* 80 Cal.. 114, [3 Am. St. Rep. 112, 22 Pac. 53] ; *Fresno Canal Co.* v. *Dunbar,* 80 Cal. 530, [22 Pac. 275].) By declaring that it should have the effect of a covenant running with the land of one party and with the canal of the other, the parties merely adopted the technical definition of such covenants to express their intention, and, in effect, declared, in the words of the Civil Code, section 1460, that the rights under the agreement should be "appurtenant to such estates, and pass with them, so as to bind the assigns of the covenantor and to vest in the assigns of the covenantee, in the same manner as if they had personally entered into them." This is not a declaration that it should bind the canal. Hence it does not come within the rule of the cases above cited, and it created no lien on the canal. But the agreement is, in legal effect, an agreement to· sell a right or interest in real property. Water, flowing in a canal or artificial conduit and delivered therefrom upon land, for the irrigation of that land, does not change its character from realty to personalty. It remains real property throughout the process and until it serves its purpose by being absorbed into the land which it moistens. Hence, the agreement to furnish the necessary water from the canal from year to year, during the times specified, and to deliver it upon the Threlfall lands for the irrigation thereof, for an agreed price, was, in substance and effect, an agreement for the sale of real property of the canal company. Such an agreement, with all its terms, is binding, not only upon the maker, but upon all persons who subsequently acquire the maker's title to the property agreed to be sold, with notice of the agreement. The plaintiff, as we have seen, bought with notice, and it is therefore as much bound to comply with this part of the agreement according to its terms as if it had executed the same.

The agreement is sufficiently certain in all its particulars. The water to be furnished and sold was identified by describing it as water from the Stanislaus River to be carried through the canal of the company. It was shown by the evidence that the company had but one canal leading from that river. The lateral was not described except by the

statement that the company was to deliver the water on the land by means of such headgates, weirs, and devices as it should construct for that purpose. This left the company at liberty to choose the location and size of the ditch, provided it was so located and was of sufficient size to comply with the terms of the agreement. The uncertainty in this respect did not render the agreement invalid. It was made certain when the ditch was constructed. (*Winslow* v. *Vallejo,* 148 Cal. 725, [113 Am. St. Rep. 349, 84 Pac. 191].) Thus the subject of the agreement, the means by which it was to be performed, and the price to be paid, were sufficiently identified and described. As the Stanislaus and San Joaquin Water Company had already received part of the agreed price, neither it, nor its successor, the plaintiff, was entitled to claim more than the balance of $1.50 per acre for each year, as provided in the agreement.

5. The appellant suggests that under the provisions of article XIV of the constitution, adopted in 1879, the use of water appropriated for sale, rental, or distribution is a public use, the regulation and control of which, including the right to collect compensation for such use, is vested in the state, and that, by reason of these provisions, the making of a contract whereby one citizen is given the exclusive right to a part of such water, or by which it is set apart to a particular tract of land, at a rate fixed in the agreement, would destroy the control of the state and convert the public use into private property.

If the water-right of the Stanislaus and San Joaquin Water Company was in private ownership and use at the time the constitution of 1879 was adopted, we do not see how it could become dedicated to public use by the adoption of the constitution, or at all, except by consent, express or implied, of its owners. The record does not show whether it was acquired before or after that date.

But if it is conceded that the water-right has become subject to public use in the sense in which that term is used in the constitution, we do not think that any violation of the constitution appears. The constitutional provision was not intended to prevent a landowner from acquiring and attaching to his land a right to the permanent use of water for its irrigation. If the right to the use of water for that purpose cannot be made per-

manent, but is subject to change or termination at the hands of the public authorities under the guise of regulation and control, then such use would be of little value. Water for irrigation is not ordinarily used for annual crops for which the place of use can be changed from year to year, perhaps without serious injury, but for trees, vines, and alfalfa, which must be given water each year for a series of years, to be successfully grown at all. To make land valuable for such use, it must have the right to a permanent and continuous use of water. The constitutional provision was not intended to prevent this. The purpose was to foster and encourage such industries, rather than to hamper and obstruct them by destructive limitations upon the right of acquiring private property. Permanent rights to the use of water for irrigation may still be obtained by contract, notwithstanding the provisions of the constitution, subject only to the condition that the state may, if it chooses to do so, regulate and control the use. This question was fully considered and decided in *Fresno C. & I. Co.* v. *Park,* 129 Cal. 443, [62 Pac. 87], and we refer to that case for a full discussion of the subject. How far the state can go in the regulation and control of the use when thus secured by private contract it is not necessary here to decide. The legislature had delegated the power of control and regulation of waters outside of cities, to the boards of supervisors of the respective counties. (Stats. 1885, p. 95; Stats. 1897, p. 49; Stats. 1901, p. 80.) It does not appear that there has been any attempt to regulate or control the use of water in Stanislaus County, and, consequently, the terms of the contract remain in full force and constitute the measure of the rights of the parties. (*Fresno C. & I. Co.* v. *Park,* 129 Cal. 443, [62 Pac. 87].) And under the present statute the contract rights prevail in all cases, the boards of supervisors being powerless to affect or interfere with them. (Stats. 1897, p. 49.)

There are no other questions demanding notice.

The judgment is affirmed.

Angelotti, J., Lorigan, J., McFarland, J., and Henshaw, J., concurred.