[Civ. No. 3457.   Third Appellate District.—March 19, 1928.]

C. P. BROOKS et al., Respondents, v. OAKDALE IRRI-GATION DISTRICT (a Public Corporation) et al., Appellants.

P. H. Griffin, Griffin, Boone & Boone and Nutter, Hancock & Rutherford for Appellants.

L. J. Maddux for Respondents.

PLUMMER, J.—Plaintiffs had judgment in an action prosecuted to establish a preferential right to the use of certain waters of the Stanislaus River, from which judgment the defendants appeal.

The plaintiffs are the owners of certain tracts of land located within the vicinity of Knights Ferry, in the county of Stanislaus, which lands have been irrigated for over fifty years from waters taken from the Stanislaus river and conveyed to said lands by means of a certain dam and ditch diverting the waters of said Stanislaus River thereto. None of the lands belonging to the plaintiffs lie within the exterior boundaries of either the Oakdale Irrigation District or the South San Joaquin Irrigation District. The two districts just mentioned were organized during the year 1909.

The transcript shows that sometime during the year 1853 a dam was built in the Stanislaus River at a certain point known as and called "Six Mile Bar," lying between the counties of Calaveras and Tuolumne, from which point water was diverted and conveyed through a certain ditch, which became known thereafter, at a period not mentioned, as the "Schell Ditch," to the vicinity of Knights Ferry in the county of Stanislaus, and there and thereafter used for mining, domestic and irrigation purposes. At just what period the use of such waters was begun to be made for irrigation, the record does not disclose, further than that such use was made of said waters at a period antedating the date of the trial at least fifty years. From the date of the inception of the use of said waters through the ditch herein referred to for domestic and irrigation purposes, such use was continued without any particular extension thereof, down to the year 1887. The record does not disclose just how many

acres of land were irrigated at that date. During the trial of the action it was stipulated that the plaintiffs, at and prior to the acquisition of any rights in and to the waters of the Stanislaus River by the two irrigation districts, defendants in this action, were irrigating 255.55 acres of land.

For some period prior to the year 1887 it appears that twelve persons had been the owners of the dam and ditch herein referred to and of the waters diverted from the Stanislaus River thereby and conveyed to the lands situate and lying within the vicinity of Knights Ferry in Stanislaus County, and use thereof made by the predecessors in interest of the plaintiffs in this action. At just what period of time said persons became the owners of said waters and means of diversion the record does not clearly indicate, nor does such fact seem material in this action. During the year 1887 all of the twelve persons referred to, granted, bargained, sold, and conveyed all their rights in and to the waters of Stanislaus River and the dam and ditch referred to herein. Such rights were conveyed to three persons named F. M. Tarpey, L. U. Shippee, and James A. Morrissey. The record shows further that during the year 1887 and prior to the conveyance M. F. Tarpey, L. U. Shippee, and James A. Morrissey of the rights of the twelve persons herein referred to, the said M. F. Tarpey, L. U. Shippee, James A. Morrissey, John Gambetti, and Abraham Schell filed notices of appropriation of water claiming the waters of Stanislaus River to the extent of several hundred thousand inches thereof measured under four-inch pressure, the notices of appropriation of such waters setting forth that it was proposed to divert the same by a dam or dams to be built in said Stanislaus River at a place indicated thereon other than the Six Mile Bar dam herein referred to, and that it was proposed to divert the waters of said river by canals and ditches thereafter to be built, and to convey said waters to the counties of Stanislaus and San Joaquin for purposes of irrigation, etc., including the sale thereof for use for the various purposes named in said notices of appropriation. After the posting and filing of such notices of appropriation three of the individuals named acquired all the right that had been owned in and to the waters of the Stanislaus River and the dam and ditch herein mentioned and referred to as having been erected, maintained and used for many years prior to the year 1887.

A number of the deeds of conveyance transferring to M. F. Tarpey, L. U. Shippee, and James A. Morrissey the rights of the twelve individuals herein referred to, in and to the waters of the Stanislaus River and the dam and ditch by means of which said waters were diverted to and used in the vicinity of Knights Ferry, contained reservation clauses to the effect that a preferential right should always exist in favor of the users of said water living in and about Knights Ferry where said water had been used for purposes of irrigation, mining, etc., prior to the date of the execution of the deeds of conveyance. The reservation was not contained in all of the deeds of conveyance, but in those in which it was contained, it appears in the following words, to wit:

"This deed is made by the party of the first part and is accepted by the parties of the second part on this express condition and understanding that said parties of the second part and their assigns are to have the waters of said ditch used or sold for use in Stanislaus and San Joaquin Counties, and that the people and persons residing in and about Knight's Ferry and vicinity and their heirs and assigns are to have all the waters that their needs may require for agricultural, horticultural, mining, vineyard, irrigating and domestic purposes, the same as they have had the same heretofore from the owners of said ditch; and the Knight's Ferry Ditch which supplies the town of Knights Ferry with water and which ditch takes its water from the San Joaquin County Ditch, paying for the same, it is also to be supplied by the said parties of the second part and their assigns as it has been supplied heretofore; and the people and all persons as aforesaid and their heirs and assigns are to be preferred in the use of said water; and the charges for such use to the persons now using the same, and to those who may hereafter use the same and their heirs and assigns, in and about Knight's Ferry and vicinity shall not be greater than they are now, and in case the charges for the use of such water be reduced, all persons as aforesaid shall have the water at such reduced rates.

"And the said parties of the second part for themselves and their assigns agree that upon taking possession and control of said ditch property, that they will furnish and supply the party of the first part and all persons now using the waters of said ditch with all water that their needs may

require, the same as they have been heretofore furnished and supplied by the present owners of said ditch.''

After acquiring the rights of the twelve individual owners of the Schell ditch and the waters diverted thereby, and after filing notices of appropriation of several hundred thousand inches of the waters of said Stanislaus River by Messrs. Tarpey, Shippee, and Morrissey, said last-named persons transferred all their interest in and to said waters and the dams and ditches diverting the same, to the San Joaquin Land & Water Company, which company in the year 1894 transferred all its interest in and to said waters, dams and ditches to one H. W. Cowell, who in the same year transferred all his interest in and to said water, water rights, dams and ditches to the Stanislaus and San Joaquin Water Company, this deed reciting that it was made subject to the rights of the users of water through the Schell ditch and was made subject to the conditions and requirements of furnishing water to persons within the vicinity of Knights Ferry, as set forth in the deeds hereinbefore referred to. The record shows that after this transfer a mortgage was executed upon said property and a foreclosure sale thereafter took place and the property referred to conveyed by a trustee to the Stanislaus Water Company in the year 1899. This company thereafter, and during the year 1907 conveyed all its interest in and to the waters of the Stanislaus River and dams and ditches hereinbefore referred to, to the Consolidated Stanislaus Land and Water Power Company, which latter company in the year 1910 conveyed all its interest in and to said waters, dams, ditches, etc., to the defendants in this action. Thereafter, and during the year 1913, it appears in the record that the two irrigation districts entered into an agreement by virtue of which the South San Joaquin Irrigation District was to supply water to lands owned by the Frankenheimer Brothers situate outside of the exterior limits of the South San Joaquin Irrigation District, and that the Oakdale Irrigation District would supply water to the plaintiffs herein and residents of Stanislaus County, owning lands in the vicinity of Knights Ferry lying outside of the Oakdale Irrigation District, which lands had been theretofore furnished with water as hereinbefore stated.

The judgment of the trial court awarded the plaintiffs a continuous flow of waters of the Stanislaus River to the extent of four second-feet of water to be conducted and conveyed to them along the same course and line of ditch by which the waters of the Stanislaus River had been conveyed to them, and to their predecessors, as stated herein.

No issue is raised as to the sufficiency of the findings, nor that the quantity of water awarded to the plaintiffs is not necessary or that beneficial use has not been made thereof by the plaintiffs, nor is there any issue presented or any question raised that such quantity of water has not been conveyed to the lands of the plaintiffs for a long period of time, nor that such quantity of water was not beneficially used by the plaintiffs and their predecessors upon the lands referred to in the complaint at the time when the predecessors of the plaintiffs filed their notices of appropriation of the large volume of water flowing in the Stanislaus River, as hereinbefore referred to. None of these questions being presented by the briefs of counsel, they are not inquired into by the court. The only issue tendered for our consideration is whether the plaintiffs, as the successors in interest of the lands and premises to which the waters of the Stanislaus River were diverted and conveyed before M. F. Tarpey, L. U. Shippee, James A. Morrissey, and John Gambetta filed their notices of appropriation of several hundred thousand inches of water of Stanislaus River and then acquired the rights of the prior appropriators in and to the waters diverted by the dam built at Six Mile Bar and the ditch constructed therefor conveying water to the lands of the plaintiffs, have a prior right, or as expressed in the briefs, a preferential right to the use of the waters of the Stanislaus River to the extent of four second feet thereof in continuous flow. On the part of the appellants it is contended that a public service corporation can grant no preferential rights. On the part of the respondents it is contended that the deeds of conveyance by which title to the waters in question has been transmitted to the appellants, reserve such right, and that the two irrigation districts, as successors in interest, are bound to furnish to those having lands lying within the vicinity of Knights Ferry, the quantity of water referred to in the reservation contained in the various deeds of conveyance. It may be here stated that the reservations in the

deeds of conveyance are so uncertain and indefinite in their application that no judgment could be based thereon, and in the consideration of this case the reservations in the deeds of conveyance are not considered as being material to a decision herein. As we have stated, no issue is raised and no argument presented in the briefs relative to the beneficial use of the waters, made by the plaintiffs and their predecessors in interest, and whatever we have to say is predicated upon the assumption that the plaintiffs and their predecessors in interest have made, and were at the time of the conveyances herein referred to making, beneficial use of the quantity of water held necessary by the trial court in its findings. ▮▮▮ As thus clarified we have only to determine whether irrigation districts acquiring water rights of prior appropriators to dams and ditches conveying said waters to lands situate outside of the district and then proceeding by much larger appropriations to build its dams so as to obliterate the dam used in diverting water by the prior appropriators and conveying water included in the larger appropriations and using the same upon large tracts of land situate within the exterior boundaries of the irrigation districts, are relieved from furnishing water in the manner and to the extent that it was furnished and used by the owners of lands lying outside of the limits of the irrigation districts, which waters were so furnished in a certain manner and in a certain quantity prior to the time of the irrigation districts obtaining title thereto and making its larger appropriations and diversions. The question at issue is a trifle narrower than what we have just stated. On the part of the respondents it is contended, and apparently uncontradicted, that the lands owned and farmed by the plaintiffs are different in character and location from the lands lying within the exterior boundaries of either of the irrigation districts. It appears that the lands lying in and about Knights Ferry are somewhat hilly, being more or less situate in the foothills between the level lands of San Joaquin Valley to the westward and the more or less precipitous mountains to the eastward. The quality of the soil also is such that it washes away readily and cannot be beneficially irrigated by flooding. That a large percentage of the lands irrigated by the plaintiffs is set out to orchards and vines, to irrigate which beneficially requires a continuous flow of a

small stream, and if furnished in that manner, highly beneficial uses can be made thereof, but if the flooding method is pursued, the lands on the hillsides would be washed away and instead of benefited would be materially injured. Thus, it is more a question of the method of furnishing water than the fact of furnishing water, the respondents claiming that the water should be furnished by the method pursued prior to the acquiring of any rights therein by the appellants and according to the method by which the plaintiffs have been enabled to plant, cultivate and grow vines and orchards of much value. On the part of the appellants it is maintained that the plaintiffs have no rights different from those belonging to land owners within the respective irrigation districts, and if the irrigation districts furnished water to the land owners within its territorial limits in a certain manner and for use by the flooding method, that all obligations to furnish water to the plaintiffs have been discharged if water is furnished to them in the same manner.

We agreed with the appellants that all the waters of the Stanislaus River referred to in this action have for a long period of time been devoted to a public use, and that the owners of the water right instituted in 1853 and thereafter continued by the building of the dam at Six Mile Bar and the ditch conveying the waters of said stream to the vicinity of Knights Ferry were diverting and devoting such water to a public use.

This brings us to a consideration of the authorities cited by the respective counsel and the authorities collated by the court bearing upon the briefs involved and their application to the questions here to be decided. We will first examine the five cases upon which appellants base their contention that the judgment of the trial court should be reversed. In *Leavitt* v. *Lassen Irrigation District*, 157 Cal. 82 [29 L. R. A. (N. S.) 213, 106 Pac. 404], the plaintiff asserted his right to the prior use of water for a ranch belonging to him, based upon the following facts: The plaintiff by his own testimony showed that he had appropriated the waters of Susan River for the purposes of sale, rental and distribution; that after the construction of the irrigation system for the diversion of the waters so appropriated by the plaintiff, he diverted a large quantity of the waters of the system to irrigate a ranch belonging to him. Subsequently, the plain-

tiff sold his water system, but, in selling, reserved to himself a prior and preferred right to take from said system a sufficient quantity of water to properly irrigate, during the irrigating season of each and every year, all the lands comprising his said ranch. The trial court found in accordance with such testimony, and further, that the defendant bought with knowledge of such reservation, and judgment was correspondingly entered awarding to the plaintiff a preferred right in and to the waters furnished irrigators by said system. The supreme court, in discussing the claimed rights of the plaintiff in and to said waters and the possibility of a private right being established therein, used the following language: ''Therefore, the only tenable ground upon which respondent can stand is that, with his appropriation for public use, he became a private appropriator of water for use on his Buggytown ranch. If this be so, then his rights to water would be measured as are the rights of every other private appropriator—not by the amount which he took, not by the amount which he claimed, not, as the court decrees, by an amount sufficient thoroughly and properly to irrigate a thousand acres of land; but it would be measured by the amount which he had been actually taking and applying to a beneficial use upon that land. His right to priority in the use of water would also be measured according to these facts and limited to this quantity. (*Senior* v. *Anderson*, 115 Cal. 496 [47 Pac. 454]; *Smith* v. *Hawkins*, 120 Cal. 86 [52 Pac. 139]; *Strong* v. *Baldwin*, 137 Cal. 440 [70 Pac. 288].) The findings and judgment as above quoted establish that the court adopted the erroneous view that respondent, by his so-called reservation, had been able to secure for himself an undetermined quantity of water, without regard to the amount which he had been beneficially using. The findings and judgment are silent upon the question as to this latter amount, and the judgment upon this cause of action must, therefore, be reversed. This discussion has been upon the assumption that Leavitt did in fact make a private appropriation of water for use upon his Buggytown Ranch in connection with his appropriation of the waters of Susan River for public use. If, however, the facts should be that he did not make such private appropriation, his attempted reservation of a private right out of a public trust, as above stated, would be futile and void.'' The court then takes

up the question as to the appropriation of water subsequent to the year 1879, the year of the adoption of our present constitution, and states the law as follows: "The fundamental and all-important proposition, then, is this, that a public service water company which is appropriating water under the Constitution of 1879 for purposes of rental, distribution and sale, cannot confer upon a consumer any preferential right to the use of any part of its water. Even before the adoption of the Constitution of 1879 and its declaration therein contained (Art. XIV, sec. 1), it is said by this court in *Price* v. *Riverside L. & I. Co.*, 56 Cal. 431: 'Every corporation deriving its being from the act above cited, has impressed upon it a public trust, the duty of furnishing water, if water it has, to all those who come within the class or community for whose alleged benefit it was created.'" And further, quoting from *McCrary* v. *Beaudry,* 67 Cal. 120 [7 Pac. 264]: "Whenever water is appropriated for distribution and sale, the public has a right to use it, that is, each member of the community, by paying the rate fixed for supplying it, has a right to use a reasonable quantity of it in a reasonable manner." The court then goes on in its opinion to discuss the right of a public service corporation to make specific contracts for furnishing water, and distinguishes the Leavitt case from that of *Stanislaus Water Co.* v. *Bachman,* 152 Cal. 716 [15 L. R. A. (N. S.) 359, 93 Pac. 858], which had to do with a contract for furnishing water by the Stanislaus Water Company and the right to change or readjust the charges therefor. The judgment of the lower court was reversed for the reason that no private appropriation was shown, and that a public service corporation could not grant any preferred rights. There is nothing, however, in the opinion in the case of *Leavitt* v. *Lassen Irrigation Co., supra,* which touches upon, or in any manner limits or extends or explains the rights and duties of a public service corporation to furnish water to those who have previously obtained water from an irrigation system purchased by such public service corporation. The distinction between a reservation by a seller of a public service corporation of a preferential right to a use of the waters furnished by said stream and the rights of users of water furnished by a public service corporation by a grantee thereof, are separate and distinct, and only one of these

questions was involved and decided in the Leavitt case. That is, the ruling of the court was to the effect that Leavitt could not, as against other consumers of water furnished by the same system, reserve a preferential right in himself. No question as to the duty of the grantee to continue the service to other users of water furnished by the stream as it had been furnished prior to the purchase of the stream, was involved. The cases of *Byington* v. *Sacramento Valley Westside Canal Co.*, 170 Cal. 124 [148 Pac. 791], and *Brewer* v. *Railroad Commission*, 190 Cal. 60 [210 Pac. 511], involved two questions, the Byington case holding that a public service corporation could not grant preferential rights to any waters appropriated by it and dedicated to the public use; and the Brewer case holding that a water company which had dedicated its waters to the public use cannot revoke such dedication and convert its waters to a private use, without the consent of all of the beneficiaries of such use. In the case of *Butte County Water Users Association* v. *Railroad Commission*, 185 Cal. 218 [196 Pac. 265], the question involved affected the right of users of water under a certain system, and not the taking away or limiting or changing the service, the right to which had been acquired under and by virtue of a certain appropriation and diversion of water. The petitioners who had been served with water under the established system owned and operated by the Sutter-Butte Canal Company petitioned the railroad commission to restrain or prohibit the company from extending their system so as to supply water to additional consumers. The court in that case, while upholding the order of the Railroad Commission, did state in substance as follows, that "a water company supplying water for irrigation has not the power to take on new customers after the demands of its consumers upon it have reached the limit of its supply." The court upheld the order of the Railroad Commission in its finding that the taking on of the additional consumers would not be detrimental. The right to take away waters or change the service of waters which had been initiated by use long prior to the acquisition of the dam and ditch by means of which the prior appropriation of waters had been affected and distribution made thereof to certain consumers, was not involved in determining the duty of the Sutter-Butte Canal Company. One system only was

involved. The right to a continued service of water-users to water furnished through a ditch outside of an irrigation district and which water right, as is shown in the case at bar, was acquired long prior to the creation of the irrigation districts and subsequently merged into a much more extensive appropriation and diversion of waters, presents a problem not presented or decided in any of the cases cited by appellants, as shown by the foregoing *résumé* thereof. Nor do we find anything in the case of *Glenn-Colusa Irrigation Co.* v. *Paulson,* 75 Cal. App. 57 [242 Pac. 494], decided by this court, which in any way trenches upon or limits the right to a continued service of water through what we have called the Schell ditch, to the plaintiffs owning lands in the vicinity of Knights Ferry, just as those rights were acquired by the grantors of the plaintiffs long prior to the extensive appropriation of the waters of the Stanislaus River in 1887 by the grantors of the appellants herein, and who, during that year, became the grantees of the smaller system or dam and ditch diverting and furnishing water from the Stanislaus River to the plaintiffs' grantors. This court did hold in the Paulson case, as set forth by appellants, that "no private estate can be created in property devoted to a public use, and a consumer of water cannot have a water right, in the sense of a private freehold interest, in the real estate of the distributing company; his right is simply a right of service so long as the public utility controls the instrumentality rendering the service, and the exercise and enjoyment of such right of service does not create an easement such as is contemplated by section 552 of the Civil Code, but is a service rendered by a public utility, subject to the regulation and control of the State in such manner as may be prescribed by law." This court was there dealing with a question involving the rights of a water user who had been furnished water by a bankrupt public utility or company furnishing water to the public. Faced with the fact that the Railroad Commission could not compel the bankrupt company to continue the service, but had authority to permit the bankrupt company to make sale of its water rights, and also faced with the fact that the sale of the water rights belonging to the bankrupt company could not be made so as to deprive Paulson and others of the service which they had formerly received and had acquired

the right to receive, the Railroad Commission under the constitution being empowered to determine the conditions of the use, authorized the sale of the water rights of the bankrupt company to the Glenn-Colusa Irrigation District subject to the condition of furnishing water to Paulson and others upon their lands being brought within the territorial limits of the irrigation district, made the sale conditional upon the district admitting the lands into the district that had formerly been served with water by the bankrupt company. A denial of such admission would have revoked the transfer of the water right of the bankrupt company to the irrigation district.  Paulson and others, notwithstanding such recognition of their rights to continued service, declined to accept the conditions imposed by the Railroad Commission, and thus forfeited their rights to service.  Applying the doctrine set forth in the case of *Glenn-Colusa Irrigation Co.* v. *Paulson,* had the transfers of the water rights and ditches involved in this case been a matter within the jurisdiction of the Railroad Commission, the affecting of the transfers would have been upon the condition of furnishing service to the water-users in and about Knights Ferry upon their paying the charges fixed and established as the compensation for such service.  And the rights of service of the plaintiffs would have continued just so long as they continued to pay the charges.

As the rights to take water from the Stanislaus River and divert the same by means of a dam located at Six Mile Bar and a ditch leading therefrom to the plaintiffs' land were initiated, and the rights to the use thereof were acquired long prior to the adoption of the constitution of 1879, we are now considering in this case whether any of the rights of the parties hereto are subject to the provisions of section 1 of article XIV of the constitution, but are dealing with the questions involved as waters devoted to a public use through the limited system which we have described, which latter passed into the ownership of corporations and then on down into the ownership of irrigation districts owning a much larger proportion of water and building or creating an extensive irrigation system or systems not including the lands owned by the plaintiffs and their grantors.  In other words, the case presents not the duty of an irrigation system to its consumers, but the duty and liability of a transferee of the

irrigation system or dam, ditch, and waters to continue the services as therefore furnished to the plaintiffs and their grantors. In 26 California Jurisprudence, page 484, section 728, the law relating to the duty and liability of a transferee of a system, is thus stated: "As elsewhere pointed out it is a general rule that a public utility including a water corporation cannot lawfully be transferred by the owner thereof without the sanction of the State or an agency thereof. Nor is the transfer valid unless the transferee has the power to accept the property and continue the use to which it has been devoted. The transferee of the system takes the franchise and property pertaining thereto subject to all the burdens, and is obliged to continue the performance of the public service to which the franchise and property had been dedicated. The transferee is also bound by the terms of valid contracts of the grantors of which it has notice, such, for example, as a contract to furnish water at a specified rate."

Thus, M. F. Tarpey, L. U. Shippee, and James A. Morrissey, the grantors through whom the irrigation districts base their extended claim to ownership of the waters of the Stanislaus River, could not, after acquiring the Six Mile Bar dam and ditch leading therefrom to the plaintiffs' lands, from the owners thereof, limit the right to service of water furnished through the ditch heretofore called the Schell ditch, simply by filing notices of the large appropriations of the waters of the Stanislaus River which we have mentioned, and then proceed to build the irrigation system which has now ripened into miles of canals, ditches, reservoirs, and immense dams belonging to the appellants. As grantees of the twelve owners of the Schell ditch, Tarpey, Shippee, and Morrissey became, by virtue of the law, immediately charged with the duty and liability of furnishing service of water to the grantors of the plaintiffs just as their rights existed at the date of the transfer in the year 1887. The reservations in the deeds added nothing to the rights of the users of water furnished by the ditch referred to. The rights of the plaintiffs' grantors would have been exactly the same had the deeds been absolutely silent on the subject. The only effect that the deeds could have would be to give notice to the grantees of the fact that such rights existed and that they took the property burdened with the service that had

been already established. The appellants being in the line of grantees of the persons just named are in no different situation.

The principles which we have just stated find expression in the opinion of *Escondido Mutual Water Co.* v. *Escondido,* 169 Cal. 772 [147 Pac. 1172], in an opinion written by Justice Henshaw, who also wrote the opinion in the case of *Leavitt* v. *Lassen Irrigation District, supra.* In dealing with the right to a continued use of water in the manner in which it had been formerly supplied and used, and also of the fact that such use cannot be changed to the injury of those entitled to rely upon its continuance, we find the following in the opinion: "It would be sufficient here to point out that a public use in waters may cease and determine, and that this may be accomplished by consent of all parties in interest, or by operation of law. It is to be borne in mind that it is only the use of waters appropriated for sale, rental, or distribution which is a public use under the Constitution (art. XIV, sec. 1), and while it is true that when any water has been so devoted to a public use, the public, and each individual member thereof as a part of the public, has a right to the continued use of that water, so that the use may not be changed to the injury of those entitled to rely upon its continuance, and, if abandoned by the purveyors of the use, may be taken over to the end that the use may be continued, it by no means follows, as said in *Fellows* v. *City of Los Angeles,* 151 Cal. 52 [90 Pac. 137], that the public use impressed upon any particular water supply may not be abandoned. A simple illustration will make clear our meaning. A man has developed water from wells and springs upon his own land and has devoted that water to the public service of a near-by town. He is using the water for rental, distribution, and sale. He has impressed it with this public use. Should he undertake to sell his supply the purchaser would buy it with the burden of this use attached. Should he sell his lands the purchaser of the lands, if he acquired the water by that purchase, would take them under the same burden." The burden assumed by the grantees in the case at bar was the furnishing of the service in such manner that the lands, orchards, vines, and products of the lands owned by the plaintiffs should not be injured, and the burden was further that the

service should be the same as that upon the faith of the continuance of which the plaintiffs and their grantors had devoted their lands to orchards, vineyards, and products requiring a particular service. The question presented in the case at bar are very similar to those answered in *East Bay Municipal Utility District* v. *Railroad Commission*, 194 Cal. 603 [229 Pac. 949], where property was acquired outside of the utility district. The court there said, with reference to the duty imposed upon the city of Pasadena: "It will be obliged to put it to the same use as fully as that company is now compelled to do. Water which is in this manner dedicated to the use of an outside community cannot be, at the same time, surplus water subject to sale to others. . . . The City of Pasadena, with respect to this part of the water, will hold title as a mere trustee, bound to apply it to the use of those beneficially interested. So in this case the petitioner would be acquiring the property outside the district as necessary or convenient to the full exercise of the granted powers and would be required to discharge its duties to the outside consumers as required by law. The petitioner has the power to acquire the works and system outside the district. If it should do so, it would acquire such property subject to the burden of servitude of continuing the service and on no just principle could it continue to hold the property outside the district discharged thereof."

To the same effect is the case of *Riverside Land Co.* v. *Jarvis*, 174 Cal. 316 [163 Pac. 54], where it is also further said: "If the right was a public right pertaining to the land by reason of the fact that it was a part of the territory to which the public use for irrigation had attached, as must have been the case if the land was at that time lawfully receiving the water dedicated to public use, then it would be the duty of the water company (a grantee), to continue to supply to that land a reasonable proportion of the water so dedicated to the public use. Whether dedicated to public use upon a class of lands not all contiguous, or upon all lands within a defined territory, such water could not lawfully be diverted to other lands by the agent in charge of the use, but must be supplied to the land to which it is dedicated." (Citing a number of cases.) As we have seen, the waters used by the plaintiffs and their grantors were dedicated to uses upon particular lands and that use

cannot now be taken away to the detriment of the lands whereon it has been made beneficial use of by the appellants herein who are charged with the burdens of furnishing a service necessary to the proper use, cultivation and irrigation of the lands whereon the waters were being used at the time that the owners of the Schell ditch executed the conveyances herein referred to. To the same effect is the case of *South Pasadena* v. *Pasadena Land & Water Co.*, 152 Cal. 579 [93 Pac. 490], where it is further held that "in case of the establishment of a water system to supply water for public use, all persons to whose use the water is appropriated or dedicated are vested with the right to have the supply continued by whomsoever may be in control thereof, and may enforce such right by *mandamus*," etc. See, also, *Hewitt* v. *San Jacinto Irrigation District*, 124 Cal. 186 [56 Pac. 893]; *Stanislaus Water Co.* v. *Bachman*, 152 Cal. 725 [15 L. R. A. (N. S.) 359, 93 Pac. 858]. This latter case is somewhat different, the decision being based upon contracts. See, also, *La Mesa etc. Irrigation District* v. *Halley*, 197 Cal. 50, and page 67 thereof [239 Pac. 719] (citing the cases hereinbefore referred to).

No issue being raised as to whether the lands belonging to the plaintiffs required the kind of service to which they were accustomed prior to 1887, and which was continued for long years thereafter, it necessarily follows from what we have stated that when Messrs. Tarpey, Shippee, and Morrissey acquired the system or dam and ditch that had been used in conveying water to the lands of the plaintiffs' grantors, they assumed the burden of a continued service then necessary to the beneficial use of the lands and premises owned by plaintiffs' grantors, and on the faith of the continuance of which plaintiffs' grantors had used their lands in a certain manner and devoted them to certain purposes, the burden of continuing such service was immediately assumed by the grantees above named, irrespective of the reservations contained in the deeds of conveyance, and that burden has been carried all the way down and placed upon successive grantees, and now rests upon the two irrigation districts, defendants in this action.

The judgment of the trial court is affirmed.

Hart, Acting P. J., and Bartlett, J., *pro tem.*, concurred.