[No. 45113.   En Banc.   August 10, 1978.]

CLYDE BROWN, ET AL, *Respondents*, v. C. W. CHARLTON, ET AL, *Appellants*.

*Bantz, Hemovich & Nappi,* by *William B. Bantz,* for appellants Charlton.

*Lukins, Annis, Bastine, McKay & Van Marter, P.S.,* by *Martin G. Weber,* for appellants Meagher.

*Paine, Lowe, Coffin, Herman & O'Kelly,* by *Curtis L. Shoemaker* and *Gary A. Dahlke,* for respondents.

BRACHTENBACH, J.—The problem before us is to determine who, if anyone, is responsible for fulfilling a subdivision plat covenant to provide domestic water. Respondent lot owners sought specific performance of the plat covenant to furnish domestic water to their lots located within the Rivervale Addition in Spokane County. The trial court

enjoined both the original subdivider and his successor in interest from refusing to operate a domestic water supply system for the benefit of respondent property owners. We affirm as to the successor in interest, but reverse as to the original subdivider.

In 1961, defendant/appellant Charlton received approval for a plat which became known as Rivervale Addition. The plat contained a covenant which provided that "[n]o lot within this plat shall be sold until domestic water has been supplied for that particular lot." Another covenant provided that "[n]o water may be resold, used or supplied by any lot owner for either domestic or irrigation purposes to circumvent service from the community water system." All parties have construed these covenants as requiring domestic water to be supplied to all subdivision lots prior to their sale.

A well located on lot 2, block 1 of the platted subdivision was intended as the domestic water supply for Rivervale Addition. After platting, Charlton commenced construction of the domestic water supply system.

In 1966, all of Rivervale Addition, except lots 1, 2 and 3 of block 1, were sold to Thomas F. Meagher, now deceased. There is a dispute between appellants Charlton and the Meagher estate as to whether lot 2, block 1 (the location of the domestic water supply well) was included in the sale. It is clear that the contract of sale did include all water rights, including the right to take water from the well located on lot 2, block 1. Also included within the agreement was the partially completed water system, irrigation pipes, water pumps, maps and all water system plans and specifications which Charlton had intended to use in the community water system.

The subdivision was unfinished when purchased by Thomas Meagher. Construction of a road and completion of the water system was necessary before the subdivision could be completed. Meagher hired an individual to complete the system, including the addition of a chlorinator, pumps and extension of existing lines.

Meagher subsequently made unsuccessful attempts to sell the entire subdivision as a unit, including the water system. A decision was then made to sell individual lots.

In 1972 and 1973, the 14 plaintiffs in this proceeding purchased lots in the subdivision. Three of the plaintiffs purchased lots directly from Meagher or his authorized agent. The remaining 11 plaintiffs purchased through intermediate grantors.

The water system was activated in 1972. From its inception, there were functional problems with the system. However, either Thomas Meagher, or subsequent to his death in August 1973, the executor of his estate, continued to operate the water system. In the interim, Meagher made unsuccessful attempts to sell the water system to third parties.

In September 1974, Michael Meagher, as executor of his father's estate, discontinued operation of the water system. Meagher contended that because he did not own the lot upon which the community well was located, he had no duty to operate the system pursuant to the covenant in the original Rivervale plat. Meagher asserted that Charlton was responsible for operation of the system as owner of the well site. Charlton also denied liability for operation of the system.

The trial court ruled that Meagher's estate was equitably estopped to deny its liability to perform the water covenant for the plaintiffs. The trial court further ruled that Charlton was liable to perform the covenant to supply domestic water by reason of his ownership of the property on which the well site was located, to which the covenant, as a covenant running with the land, applied.

In addition, the trial court ruled that the plaintiffs were not required to file a claim with the estate of Thomas Meagher and that the probate claims statute, RCW 11.40-.010, did not constitute a bar to plaintiffs' complaint.

Finally, the trial court held that Meagher had engaged in an unfair and deceptive trade practice under the Consumer Protection Act, RCW 19.86, by refusing to operate the Rivervale water system in September 1974 and awarded

each plaintiff reasonable attorney fees pursuant to RCW 19.86.090.

Although we agree with the trial court's conclusion that defendant Meagher must continue to operate the water system in fulfillment of the covenant contained in the plat, we do not believe that Meagher's liability rests on a theory of equitable estoppel.

One of the elements of equitable estoppel is reliance by the injured party on the act of the person allegedly estopped. *Mahoney v. Tingley,* 85 Wn.2d 95, 529 P.2d 1068 (1975). Although it is quite likely that plaintiffs relied on the operation of the water system when purchasing or building homes in Rivervale, the record is simply void of any concrete proof in this regard. In particular, there is no proof that plaintiffs were aware that the system was being operated by defendant Meagher. Hence, plaintiffs, if relying at all, were relying on the acts of an unknown party. Proof of equitable estoppel requires that the act relied upon be attributed to the individual who is to be estopped.

Our decision that appellant Meagher must continue to operate the water system is not dependent upon a transfer of the land on which the community well is located, which could cause liability to accrue by means of a real covenant running with the land.

We believe that the focus should be on the transfer of the water rights and water system itself. The covenant in the original plat placed an equitable burden on the well water and water system for the benefit of all subsequent purchasers of lots in Rivervale.

Any person purchasing the water rights and water system with notice, actual or constructive, of the burden on that system, took subject to the burden. *Quist v. Empire Water Co.,* 204 Cal. 646, 269 P. 533 (1928); *Henrici v. South Feather Land & Water Co.,* 177 Cal. 442, 170 P. 1135 (1918); *Stanislaus Water Co. v. Bachman,* 152 Cal. 716, 93 P. 858 (1908). This is regardless of any language requiring the original covenant to run with the land. *Henrici, supra.*

The lot owners do not acquire a water right in the sense of a freehold in the water system or the water, "but simply a right of service so long as the [successor] controls the instrumentality rendering the service." *Coulter v. Sausalito Bay Water Co.,* 122 Cal. App. 480, 497, 10 P.2d 780 (1932).

The burden imposed is essentially equitable in nature, the key fact being that a successor has taken the property with notice of the burden. *See* 5 Restatement, Property, Servitudes § 539 (1944).

■ The trial court found that Meagher had purchased the water rights and water system. There is substantial evidence to support that finding and we will not disturb it. *Local 1296, Int'l Ass'n of Firefighters v. Kennewick,* 86 Wn.2d 156, 542 P.2d 1252 (1975).

■ Further, there can be no doubt that Meagher had notice of the covenant requiring domestic water to be supplied. This is evidenced by the fact that he completed the system and for a period of several years undertook to perform that covenant. At the very least, the recorded plat containing the covenant imparted constructive notice to him. RCW 65.04.050; *Hansen v. Lindstrom,* 168 Wash. 130, 11 P.2d 232 (1932).

Nevertheless, the executor of Meagher's estate asserts that the claims of respondents are barred because of their failure to file a creditor's claim against the estate pursuant to RCW 11.40.010.

■ We disagree. Simply put, the claims of respondents did not exist until after the expiration of the 4–month period and therefore could not be barred because not presented to the estate within that period of time. *In re Estate of Macdonald,* 29 Wash. 422, 69 P. 1111 (1902).

Next, we turn to appellant Charlton's continued liability for operation of the water system. As noted above, we have construed the original covenant as creating an equitable burden on the water rights and water system for the benefit of lot owners within Rivervale.

Since the burden of an equitable servitude falls upon the owner of the instrumentality necessary to satisfy that burden, the lot owners must look to appellant Meagher, the owner of the water system, for satisfaction of the covenant. As noted above, the fact that Charlton may own the land on which the well is located is insignificant because the burden has attached to the water system and water rights, rather than the land itself. *See, e.g.,* Restatement, Property, Servitudes § 538, comments *a* and *c* (1944).

Next, we consider whether the Consumer Protection Act, RCW 19.86, is applicable to appellant Meagher.

We have recently held that certain post–sale activity may give rise to a Consumer Protection Act cause of action. *Salois v. Mutual of Omaha,* 90 Wn.2d 355, 581 P.2d 1349 (1978). Consequently, appellant Meagher's reliance on *Johnston v. Beneficial Management Corp. of America,* 85 Wn.2d 637, 538 P.2d 510 (1975), is no longer valid. However, because we hold that the facts of this case do not satisfy the public interest requirements of the Consumer Protection Act, we do not reach the issue of whether Meagher's action in shutting down the water system is the type of post–sale activity subject to the Consumer Protection Act.

To establish a violation of the Consumer Protection Act, a litigant must prove that the act complained of is "injurious to the public interest". RCW 19.86.920; *Lightfoot v. MacDonald,* 86 Wn.2d 331, 544 P.2d 88 (1976).

In *Salois v. Mutual of Omaha, supra,* the legislature had determined that the particular trade or commerce in issue was one affected by the public interest. In the instant case, the legislature has determined that certain small–scale water providers are not subject to public interest regulation. *See* RCW 80.04.010.

Further, the respondents offered no independent factual proof that the private dispute affected the public interest.

Consequently, respondents have failed to satisfy the public interest prerequisites to a Consumer Protection Act cause of action.

Finally, respondents have cross–appealed, contending (1) that attorneys' fees should have been awarded against Charlton and (2) that the trial court should have included irrigation water within injunctive relief and specified the quantity of domestic water to be supplied.

Respondents' claim for attorneys' fees against Charlton is moot inasmuch as we have concluded that Charlton has no liability under the covenant.

The original covenant required "domestic" water to be provided. In the context of these facts, we are of the opinion that "domestic" water includes sufficient water to fulfill all household needs and to provide for lawn and garden watering. We believe that the trial court's injunction was specific enough and did not have to specify the quantity of domestic water to be supplied. Further, respondents have not made clear what they mean by their claim for "irrigation" water. If that is water necessary to maintain a yard, we find it synonymous with our construction of the term "domestic" water set forth above. We believe that anything beyond that was not contemplated when the original covenant was included in the plat.

The decision of the trial court is affirmed, except as it relates to the liability of appellant Charlton and the application of the Consumer Protection Act.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, UTTER, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.

Reconsideration denied November 20, 1978.